[No. S150806. June 12, 2008.]

RODNEY JAMES ALCALA, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

1206

**COUNSEL**

Richard L. Schwartzberg, under appointment by the Supreme Court; and George Peters for Petitioner.

No appearance for Respondent.

Tony Rackaukas, District Attorney, Brian N. Gurwitz and James J. Mulgrew, Deputy District Attorneys, for Real Party in Interest.

**OPINION**

**GEORGE, C. J.**—In this matter, the prosecution moved under Penal Code section 790, subdivision (b) (section 790(b)),[1] to join five murder charges— one originating in Orange County, and the other four in Los Angeles County—in order to proceed with a single trial in Orange County. Each murder charge alleges a separate special circumstance (§ 190.2), making each

---

[1] All further statutory references are to this code unless otherwise indicated.

a charge of a capital offense. We granted review to address the Court of Appeal's conclusions that (1) intercounty joinder is proper under the statute, but (2) two of the Los Angeles murder charges must be severed for separate trial. We conclude that the appellate court was correct on the first point, but erred on the second—and therefore that a single trial on all five charges may proceed.

## I

Petitioner Rodney James Alcala was tried and sentenced to death in Orange County for the June 1979 kidnapping and murder of 12-year-old Robin Samsoe. This court reversed that judgment in *People v. Alcala* (1984) 36 Cal.3d 604 [205 Cal.Rptr. 775, 685 P.2d 1126] (*Alcala I*). Upon retrial in Orange County, petitioner again was convicted and sentenced to death. We affirmed on appeal (*People v. Alcala* (1992) 4 Cal.4th 742 [15 Cal.Rptr.2d 432, 842 P.2d 1192] (*Alcala II*)), but a federal district court set aside that judgment, and the United States Court of Appeals for the Ninth Circuit affirmed the federal district court's judgment. (*Alcala v. Woodford* (9th Cir. 2003) 334 F.3d 862.)

Petitioner again was returned to Orange County for retrial on the charges relating to Robin Samsoe. In the meantime, an Orange County grand jury issued an indictment against petitioner on four additional counts alleging the murders of young women in Los Angeles County occurring between November 1977 and June 1979. The prosecution, relying upon section 790(b), moved to consolidate the Orange County (Robin Samsoe) case with the four murder charges arising from Los Angeles County. The trial court granted that motion and refused defendant's request to sever the five murder charges. Petitioner sought relief in the Court of Appeal by way of an alternative writ of mandate or prohibition. The appellate court denied relief in part and granted in part; it concluded that joinder of all five murder charges was proper under the statute, but that retrial of the Robin Samsoe case in Orange County could proceed together with only two of the four Los Angeles County murder charges, and that the other two Los Angeles County murder charges would have to be tried separately. As noted above, we conclude that all five murder charges may be tried jointly in Orange County.

## II

A. *The Robin Samsoe case*

The Court of Appeal provided a factual recitation, which in turn was based largely upon our recitation in *Alcala II, supra,* 4 Cal.4th 742:

On June 20, 1979, 12-year-old Robin Samsoe spent the afternoon with her girlfriend, Bridget Wilvert, on the cliffs overlooking the beach in the City of Huntington Beach in Orange County. A man approached asking to take their pictures for what he represented to be a photography contest. The girls posed for him until Jackelyn Young, Wilvert's neighbor, noticed the attention being paid by the man to the young girls and interrupted them. The man hurriedly picked up his equipment and left. This individual later was identified as petitioner.[2] (*Alcala II, supra,* 4 Cal.4th at pp. 755–756.)

A few minutes later, Robin and Bridget returned to Bridget's home, where Robin borrowed Bridget's bicycle to ride to her ballet class. Robin was not seen alive again. (*Alcala II, supra,* 4 Cal.4th at pp. 755–756.)

Dana Crappa was a seasonal worker for the United States Forestry Service stationed at Chantry Flats, an area near Sierra Madre in Los Angeles County. Later on the day Robin disappeared, Crappa, while driving in that mountainous area, came upon a Datsun F10 automobile parked at a turnout. Crappa saw a dark-haired man pushing or " 'forcefully steering' " (*Alcala II, supra,* 4 Cal.4th at p. 758) a blond-haired girl toward a dry stream bed. Although Crappa considered the scene strange, she took no action. The next day, as Crappa was returning to her barracks and passing the same area, she saw the same car parked near the original site and noticed what seemed to be the same dark-haired man leaning against a nearby rock. He appeared to have dirt or stains on the front of his T-shirt. Crappa believed there was something wrong with this scenario, but again took no action and told no one. (*Id.,* at pp. 758–759; *Alcala I, supra,* 36 Cal.3d 604, 616.) Subsequently, Crappa testified that the man she saw on June 20 resembled petitioner, although she was " 'not 100% positive.' " (*Alcala II, supra,* 4 Cal.4th at p. 758.)

Five days after the original sighting, Crappa again returned to the scene. She discovered the mutilated and unclothed body of a young girl missing part of her head and whose hands and feet had been severed. She did not report this finding, nor did she reveal it to anyone, because she felt guilty about not having informed authorities what she had seen five days earlier. Four days later, Crappa returned to the scene and noticed a tennis shoe, shorts, and

---

[2] Several other young girls at the beach were approached by petitioner, who sought to photograph them. In each instance, someone was able to identify petitioner as the man taking pictures of young girls in bikinis. Petitioner also was identified by Richard Sillett, a survey party chief for the Huntington Beach recreational area. He recalled observing petitioner carrying a 35-millimeter camera with a telephoto lens, an item of particular interest to Sillett. One young woman, Lorraine Werts, was on a beach adjacent to that occupied by Samsoe and Wilvert on the same day Samsoe disappeared. Petitioner took several pictures of Werts in her bikini. (*Alcala II, supra,* 4 Cal.4th 742, 757.) As explained *post,* after petitioner's arrest the police discovered, in a storage locker rented by him in Seattle, Washington, various items of evidence—including slide photographs of Werts.

a T-shirt in a pile together. Finally, on July 2, 1979—12 days after Robin disappeared—a colleague of Crappa's discovered a human skull and some bones in the area and reported that find to the authorities. The front lower teeth were smashed in, consistent with a traumatic blow to the mouth. By this time the skull had become completely separated from the spine, and wild animals had so disrupted the decomposed remains that it could not be determined what had caused the death or whether the person had been sexually assaulted. A "Kane Kut" kitchen knife was found near the main portion of the remains. Less than a mile away, Robin's beach towel was discovered with blood on it of a type consistent with that drawn from the bone marrow of the remains. One of her personalized tennis shoes also was found, but that was the only piece of clothing retrieved. (*Alcala II, supra*, 4 Cal.4th at pp. 758–760.)

In the interim, Robin's companion, Bridget Wilvert, assisted a police composite artist in drawing a sketch of the man who took the girls' photographs. That composite sketch was distributed by the media on or about June 22. Petitioner's parole officer saw the sketch and believed it matched petitioner, particularly in light of matters known to the officer—such as petitioner's aberrant sexual interest in young girls and his familiarity with the area in which the remains were found. (*Alcala II, supra*, 4 Cal.4th at p. 756.)

When petitioner visited his girlfriend, Elizabeth Kelleher, in Long Beach on June 22, his hair was long and curly. On June 23, the composite sketch was distributed throughout the area; on that same day, petitioner straightened his hair with the aid of a chemical product. On June 26, he cut his hair. On July 8, he told Kelleher he had decided to leave Southern California for Dallas, Texas, where he planned to establish a photography business. Kelleher accompanied defendant to the Monterey Park residence he shared with his mother to help him pack for the trip.

On July 11, defendant rented a storage locker in Seattle, Washington. When he returned to California three days later, he did not mention to anyone that he had been to Seattle, and instead told Kelleher he had been to Dallas. On July 23, defendant told Kelleher he would leave for Dallas on the following day—and he told another acquaintance he would leave for Chicago. (*Alcala II, supra*, 4 Cal.4th at p. 760.)

Petitioner was arrested on July 24, however, and a search warrant was served on the home he shared with his mother. The police impounded a Datsun F10 parked at the residence and registered to petitioner, inside of which the officers found camera equipment and a briefcase containing a set of keys. Inside the home, officers seized sets of Kane Kut kitchen knives and observed a receipt for a storage locker located in Seattle, Washington. One of

the officers copied the information on the receipt but did not seize it. Officers returned the next day to retrieve the receipt, but it was gone.[3] (*Alcala II, supra,* 4 Cal.4th at pp. 756–761.)

The Seattle storage locker was searched pursuant to a warrant. Police opened the locker's two locks with keys found inside petitioner's briefcase. Inside the locker, the officers discovered (1) a box of photographs, including photographic slides taken of Lorraine Werts (see *ante,* fn. 2) at the beach on the same day Robin disappeared; and (2) a cloth pouch containing several items of jewelry, including gold earrings that, according to the testimony of Robin Samsoe's mother, often were worn by Robin and that she identified as her own. Samsoe's mother based her identification of the earrings on a modification she had made by using her nail clippers to "trim" the earrings. The striations found on the earrings were consistent with marks made by the same nail clippers in a test. (*Alcala II, supra,* 4 Cal.4th at p. 761.)

Petitioner did not testify, but presented an alibi defense.[4] He called various witnesses, who recounted that he applied for a photographer's position at Knott's Berry Farm about June 20, although none could testify to having seen him there on that date. A defense witness testified that the striations on the gold earrings were consistent with having been made with nail clippers provided by *petitioner's* mother. One witness testified that she never saw petitioner wear gold earrings like the ones worn by Robin, but another witness friend testified she believed he in fact had worn such an earring. Finally, a jail inmate who became acquainted with petitioner while the latter was awaiting his first trial on the Orange County charges, testified that petitioner told him that Robin had scratched him and yelled during the attack, and that petitioner also described Robin's body in prurient terms. (*Alcala II, supra,* 4 Cal.4th at pp. 761–763.)

## B. The four Los Angeles County charges

The relevant facts concerning the killings of four young women in Los Angeles County were set forth by the Court of Appeal below, and we adopt

[3] Petitioner's sister spoke with him by telephone following his arrest, after which she went to the home, retrieved the receipt, and gave it to petitioner's mother. The receipt could not be found thereafter. (*Alcala II, supra,* 4 Cal.4th at p. 761, fn. 7.)

[4] Although petitioner did not testify at the guilt phase of the second trial, he testified at the penalty phase concerning his alibi. (*Alcala II, supra,* 4 Cal.4th at p. 766.) He admitted molesting a child in 1972—and serving time in prison for that offense—and assaulting Tali S., one of three child molestation victims the prosecution presented at the penalty phase to prove he committed other, uncharged crimes. Petitioner likewise admitted possessing child pornography, which resulted in his serving additional time in custody for a parole violation. He further admitted raping and beating another 15-year-old girl, Monique H. Nonetheless, petitioner appealed to the jury to send him to prison for life, arguing that in prison he would be " 'absolutely harmless' " and not " 'a threat to children.' " (*Id.,* at pp. 766–767.)

that recitation with minor corrections and changes. The indictment issued by the Orange County grand jury was based upon the following information:

In November 1977, the body of Jill Barcomb was found on a remote dirt road in the Hollywood Hills, essentially nude.[5] She had suffered severe trauma to her head and face. Her skull was crushed in the left forehead area, possibly with a rock approximately seven-by-four inches in size that was found lying nearby, the pointed side of which was covered with blood. Her front teeth had been fractured. She had a bloody bite mark on the nipple of her right breast, as well as serious injuries to, and conspicuous bleeding from, the anus. Finally, she had been strangled in three different ways: with a buckled belt, with knee-high hose, and with one of the legs to the pants she had been wearing. Her body was found in a position that appeared to be posed—kneeling, with legs spread out, and with her genitalia exposed.

Barcomb stood no more than five feet tall and weighed about 95 pounds. Swabs of fluid taken from her genital area were preserved. Subsequently, the development of DNA typing techniques led to a comparison being made between the DNA in the sperm found in the swabs and that of petitioner. The samples matched, with a random correspondence occurring only once in 100 billion.

In December 1977, Georgia Wixted resided alone and was employed as a nurse. In the early morning hours she gave her girlfriend, Barbara Gale, a ride home from a bar. Gale expected to see Wixted at work the next day. After she failed to appear, law enforcement officers who went to her Malibu apartment found her dead on the floor of her bedroom. She was naked, lying on her back, with a bedspread partly under her; a nylon stocking was wrapped around her neck several times and so tightly knotted that a furrow was carved into the cartilage. She had died of strangulation and massive head injuries: Her skull had been bashed, probably with a hammer lying nearby. Her face also had been struck, and her genitals were mutilated. The contents of her purse were strewn around the bathroom; the cabinet drawers throughout the apartment were open and their contents in disarray, and there was evidence of forced entry.

Swabs of fluids were taken from the victim's anus, and a palm print was lifted from the bed's brass railing. DNA analysis of fluids from the swabs matched petitioner's DNA, with a random correspondence occurring only once in one trillion. The palm print later was compared with petitioner's, and likewise matched.

---

[5] The only clothing on her body was a sweater and top that were pulled up around her shoulders. The rest of her body was entirely exposed.

In June 1978, Charlotte Lamb was found brutally killed in a laundry room of an apartment complex in El Segundo. She was nude and had been strangled with a long lace from a shoe she had been wearing. Her head and face had been beaten. The shoelace was used as a garrote, so forcefully tightened that the cartilage around her voice box and thyroid was fractured. Her right breast was scraped and there were lacerations over her eye and to her entire genital area. She had pierced ears but was found without earrings. Swabs of fluid taken from her vaginal area later were compared to the DNA sample obtained from petitioner. The DNA found in seminal fluid on the swabs matched petitioner's DNA, with a random correspondence occurring once in 403 trillion. Her naked body appeared to be posed, with the arms behind the back and the face up.

In June 1979, a few days before Robin Samsoe's disappearance, Jill Parenteau left her place of employment early to attend a baseball game. She failed to appear for work the next day. When the police went to her Burbank apartment, they discovered evidence of a forced entry and her body on the floor of the bedroom. She had been beaten about the face and head. Parenteau had deep wounds to her vaginal and rectal areas, and fingernail scratches on her breast. She had been strangled and had suffered severe hemorrhaging throughout the area of her thyroid, voice box, and epiglottis. Her legs were spread apart; her body, completely nude, appeared to be posed with pillows propped up under the shoulders.

Swabs of fluids were taken from her genitals and her mouth. Only the oral swab revealed any seminal fluid, and the only testing undertaken was to define the serological characteristics of the contributor. That test revealed that petitioner could not be excluded from having deposited the fluid, and that the combination of serological factors was rare—it would be present in only 3.5 percent of the population.

One of Parenteau's friends, Katharine Bryant, testified she recognized petitioner. Bryant and Parenteau had gone "clubbing" one evening less than one month prior to Parenteau's death, and had encountered petitioner. They had seen him and socialized with him at a club on more than one occasion.

All of the DNA and related testing concerning the Los Angeles County charges was performed between 2001 and 2003. A further test was conducted on pieces of jewelry found in the cloth pouch retrieved from petitioner's storage locker in Seattle. One pierced earring—other than the gold earrings recognized by Robin's mother—was in the shape of a rose. DNA testing was performed on this earring, revealing that fluids from Lamb (matching with a random correspondence occurring less than once in 100 billion) remained present on the earring, even after the passage of more than 20 years.

## III

Section 790, subdivision (a), long has provided that jurisdiction for a criminal action for murder lies "in the county where the fatal injury was inflicted or in the county in which the injured party died or in the county in which his or her body was found."[6] Under this rule, homicides committed by a serial killer in different counties could not be joined in a single accusatory pleading, or otherwise consolidated for trial in a single county, but instead were required to be prosecuted successively in separate trials in different counties. This required practice often resulted in inefficiency and high costs to all parties, and forced witnesses—including surviving victims and victims' family members—to testify repeatedly and relive the often traumatic events underlying the commission of the crimes.

Senate Bill No. 469 (1997–1998 Reg. Sess.) (Senate Bill No. 469) was enacted in 1998 to address these problems by adding section 790(b), the statute at issue in the present case. (Stats. 1998, ch. 549, § 1.)[7] That section provides: "If a defendant is charged with a special circumstance pursuant to paragraph (3) of subdivision (a) of Section 190.2 [that is, multiple murder], the jurisdiction for any charged murder, and for any crimes properly joinable with that murder, shall be in any county that has jurisdiction pursuant to subdivision (a) for one or more of the murders charged in a single complaint or indictment *as long as the charged murders are 'connected together in their commission,' as that phrase is used in Section 954*, and subject to a hearing in

---

[6] The statute continues: "However, if the defendant is indicted in the county in which the fatal injury was inflicted, at any time before his or her trial in another county, the sheriff of the other county shall, if the defendant is in custody, deliver the defendant upon demand to the sheriff of the county in which the fatal injury was inflicted. When the fatal injury was inflicted and the injured person died or his or her body was found within five hundred yards of the boundary of two or more counties, jurisdiction is in either county." (§ 790, subd. (a).)

[7] A June 23, 1998, report by the Assembly Committee on Public Safety sets forth the purpose of the bill: "According to the author, 'Serial killers who go on brutal killing rampages do so without consideration of county lines. However, under current law, if a serial killer commits murder in more than one county, he must be tried separately in each jurisdiction. This results in astronomical and unnecessary costs for both prosecutors and defendants. In addition to the waste of public resources, it is unfair to victims' families who must testify repeatedly about the same crime in different trials. [¶] Senate Bill 469 would allow for the consolidation of murder charges into a single trial for serial killers who are charged with murder in more than one county as long as the murders are connected in their commission. This bill would alleviate the fiscal burden of redundant trials and lessen the emotional strain on victims. [¶] Recent multiple-county murder defendants include "The Freeway Killer" (William Bonin), "The Night Stalker" (Richard Ramirez), and "The Trailside Killer" (David Carpenter).' " (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 469 (1997–1998 Reg. Sess.) as amended June 17, 1998, pp. 1–2.)

the jurisdiction where the prosecution is attempting to consolidate the charged murders. . . ."[8] (§ 790(b), italics added.)

■ We begin with the language of the statute, affording the words their ordinary and usual meaning and viewing them in their statutory context. (*People v. Watson* (2007) 42 Cal.4th 822, 828 [68 Cal.Rptr.3d 769, 171 P.3d 1101]; *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal.Rptr.3d 623, 74 P.3d 726]; accord, *City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 625 [26 Cal.Rptr.3d 304, 108 P.3d 862].)

The People read section 790(b) as allowing a single joint trial of inter-county murder charges accompanied by a multiple-murder special-circumstance allegation so long as one substantive condition is met: "the charged murders are 'connected together in their commission,' as that phrase is used in Section 954." Petitioner, however, divines in section 790(b) another, and preliminary, substantive condition. Focusing on the phrase "and for any crimes *properly joinable* with that murder," (italics added) he asserts the statute should be read to require not only that joined murder charges be " 'connected together in their commission,' as that phrase is used in Section 954," but also that the murders each be *"part of a common plan or scheme."* (Italics added.)

■ For the reasons that follow, we agree with the People's construction of the statute. By its terms, section 790(b) specifies that jurisdiction for the trial of any charged murder shall lie in any county that has jurisdiction "pursuant to subdivision (a) [of section 790] for one or more of the murders charged in a single complaint or indictment *as long as* the charged murders are 'connected together in their commission,' as that phrase is used in Section 954." (Italics added.) As explained below, we reject petitioner's competing interpretation, because we find it more reasonable to construe the statute's "properly joinable" language as merely providing that, with respect to the charged murders, any *other* crimes (such as rape, kidnapping, etc.) that are "properly joinable" with a given murder charge *also* may be charged and tried along with that murder. We do not read the statute as imposing any substantive requirement other than that the charged murders be " 'connected together in their commission,' as that phrase is used in Section 954." (§ 790(b).)

Although petitioner cites no decision supporting his view that the statute also requires that the joined murders be "part of a common plan or scheme,"

---

[8] The statute continues: "If the charged murders are not joined or consolidated, the murder that was charged outside of the county that has jurisdiction pursuant to subdivision (a) shall be returned to that county." (§ 790(b).)

he asserts the statute's legislative history supports his interpretation. As explained below, we disagree and find instead that these materials both (1) confirm the People's construction and (2) clarify that the Legislature intended a very broad test for joinder in employing the language " 'connected together in their commission,' as that phrase is used in Section 954." (§ 790(b).)

As amended a few months after its introduction in February 1997, Senate Bill No. 469 would have conditioned joinder of intercounty murder charges upon a finding of cross-admissibility: the amended bill provided for joinder "if evidence of one or more of the charged murders would be admissible in separate trials of the other charged murders pursuant to subdivision (b) of Section 1101 of the Evidence Code."[9] (Sen. Bill No. 469, as amended June 2, 1997, italics omitted.) More than one year later, that proposed cross-admissibility test was removed in favor of the language found in the statute today, permitting joinder "as long as the charged murders are 'connected together in their commission,' as that phrase is used in Section 954." (Sen. Bill No. 469, as amended June 17, 1998, italics omitted; see § 790(b).)[10]

In rejecting a requirement that one or more of the charged murders be cross-admissible, in favor of the "connected together in their commission" language in section 790(b), the Legislature embraced a broad test that had been applied in numerous cases construing section 954.

---

[9] Evidence Code section 1101 is quoted *post*, footnote 12.

[10] Section 954 provides in full: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. An acquittal of one or more counts shall not be deemed an acquittal of any other count."
With the adoption of Proposition 115 by initiative in 1990, section 954.1 was added, providing: "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, *evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact.*" (Italics added.) As we observed in *People v. Zambrano* (2007) 41 Cal.4th 1082, 1129, footnote 10 [63 Cal.Rptr.3d 297, 163 P.3d 4], section 954.1 simply signifies that "notwithstanding section 954, a trial court may not *grant* severance, where the statutory requirements for joinder are met, solely on the ground that evidence in the joined cases is *not* cross-admissible."

Until more than 90 years ago, joinder of criminal charges in a single accusatory pleading had been strictly limited. Former section 954 read: "The indictment . . . may charge different offenses, . . . under separate counts, *but they must all relate to the same act, transaction, or event, and charges of offenses occurring at different and distinct times and places must not be joined.*" (§ 954, amended by Stats. 1905, ch. 574, § 1, p. 772, italics added.) In 1915, section 954 was amended to read in relevant part as it does today, permitting the joinder of matters *"connected together in their commission."* (Stats. 1915, ch. 452, § 1, p. 744, italics added.) As Witkin long has observed (4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Pretrial Proceedings, § 208, p. 412; see also Witkin, Cal. Criminal Procedure (1963) Proceedings Before Trial, § 207, pp. 194–195), the revised language applicable since the 1915 amendment "is broader" than the former, and "permits the joinder of different offenses not related to the same transaction or event *'if there is a common element of substantial importance in their commission,* for the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant.' " (4 Witkin & Epstein, Cal. Criminal Law, *supra*, Pretrial Proceedings, § 208, at pp. 412–413, italics added, quoting *People v. Scott* (1944) 24 Cal.2d 774, 778 [151 P.2d 517] (*Scott*); see also, e.g., *People v. Valdez* (2004) 32 Cal.4th 73, 119 [8 Cal.Rptr.3d 271, 82 P.3d 296]; *People v. Mendoza* (2000) 24 Cal.4th 130, 160 [99 Cal.Rptr.2d 485, 6 P.3d 150] (*Mendoza*); *People v. Lucky* (1988) 45 Cal.3d 259, 276 [247 Cal.Rptr. 1, 753 P.2d 1052] (*Lucky*); *People v. Matson* (1974) 13 Cal.3d 35, 39 [117 Cal.Rptr. 664, 528 P.2d 752]; *People v. Pike* (1962) 58 Cal.2d 70, 84 [22 Cal.Rptr. 664, 372 P.2d 656]; *People v. Kemp* (1961) 55 Cal.2d 458, 475 [11 Cal.Rptr. 361, 359 P.2d 913] (*Kemp*); *People v. Chessman* (1959) 52 Cal.2d 467, 492 [341 P.2d 679] (*Chessman*); *People v. Poon* (1981) 125 Cal.App.3d 55, 68 [178 Cal.Rptr. 375] (*Poon*); *Ghent v. Superior Court* (1979) 90 Cal.App.3d 944, 958 [153 Cal.Rptr. 720]; *People v. Walker* (1952) 112 Cal.App.2d 462, 471 [246 P.2d 1009] (*Walker*).) Moreover, as long observed in our cases, the requirement of section 954 that offenses be "connected together in their commission" may be satisfied even though *"the offenses charged 'do not relate to the same transaction and were committed at different times and places . . . against different victims.'* " (*People v. Polk* (1964) 61 Cal.2d 217, 230 [37 Cal.Rptr. 753, 390 P.2d 641], italics added; see also *Chessman, supra,* 52 Cal.2d 467, 492, and cases cited; *Poon, supra,* 125 Cal.App.3d at p. 68.)

■ This history, culminating in the Legislature's adoption in section 790(b) of the broad and long-construed "connected together in their commission" test from section 954, provides no support for petitioner's argument that we should read section 790(b) as requiring, in addition, that the charged murders be "properly joinable" *with each other* in some manner beyond the requirement that they be connected together in their commission. Nor do we

discern in the language or history of the statute any legislative intent to require that joined murders be part of a common plan or scheme. If the Legislature had intended such an additional requirement, we expect it would have expressly so provided in section 790(b).

We proceed to address the question whether, applying the "connected together in their commission" test to the five murders charged, there exists a "common element of substantial importance in their commission." (*Scott, supra,* 24 Cal.2d at p. 778.) All five homicide victims were young, single Caucasian females and all suffered blunt-force facial trauma. All of the offenses occurred within a 19-month period, and the body of each victim was discovered unclothed, or partially nude from the waist down. Each of the five charged murders involved what were apparently sexually motivated assaults. All four Los Angeles charges reveal clear evidence of sexual assault. Although Robin Samsoe's body was too decomposed to make a similar determination, the available evidence—including (1) petitioner's photographing bikini-clad young females on the same day and near the general location of Robin's disappearance, (2) Robin's unclothed remains, and (3) petitioner's comments to jail inmates concerning Robin (*Alcala I, supra,* 36 Cal.3d 604, 618 [inmate testified that he overheard petitioner inform another inmate that he had asked Robin whether she ever had posed nude]; *Alcala II, supra,* 4 Cal.4th 742, 761 [another inmate testified concerning petitioner's prurient description of Robin's body])—provides no rational explanation for her abduction other than an unlawful sexual purpose.

■ Moreover, in addition to the common evidence described above, as the Court of Appeal observed, the intent or motivation to brutally kill young females also ties all of the crimes together. As we held in *Mendoza, supra,* 24 Cal.4th 130, the intent or motivation with which different acts are committed can qualify as a "common element of substantial importance" in their commission and establish that such crimes were "connected together in their commission." (*Id.,* at p. 160 [the " ' "element of intent to feloniously obtain property runs like a single thread through the various offenses" ' " and constitutes a " ' " 'common element of substantial importance' " ' " in their commission].) Other cases have similarly held. (*Lucky, supra,* 45 Cal.3d 259, 276 [same]; *Chessman, supra,* 52 Cal.2d 467, 492 [same]; *Kemp, supra,* 55 Cal.2d 458, 476 [listing as one of the "common elements of substantial importance" among crimes occurring two years apart the circumstance that "[i]n each crime the obvious motive was satisfaction of appellant's sexual desires"]; *Poon, supra,* 125 Cal.App.3d 55, 69 ["the offenses joined here share numerous 'common elements'; the most significant being sexual motivation and young girl victims," and accordingly "the offenses were 'connected together in their commission' for purposes of section 954"]; *Walker, supra,* 112 Cal.App.2d 462, 471 [listing as a "common element of substantial

importance" among two crimes the circumstance that "in each instance a woman was kidnapped and a common intent is clearly disclosed"].)

Petitioner asserts intent or motivation cannot constitute a "common element of substantial importance," and, instead, only physical or objectively measurable factors, such as use of a specific individual weapon, can suffice. As shown by *Mendoza, supra,* 24 Cal.4th at page 160, and related cases cited above, California appellate courts long have held otherwise. In any event, as also noted above, we discern various other common elements. We conclude that the evidence, viewed cumulatively, amply connects the five murder charges and justifies their joinder under section 790(b). Indeed, it appears that these are precisely the types of cases that the Legislature intended to be tried jointly.

## IV

As we often have observed, because consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law. (*People v. Geier* (2007) 41 Cal.4th 555, 578 [61 Cal.Rptr.3d 580, 161 P.3d 104] (*Geier*); *People v. Stanley* (2006) 39 Cal.4th 913, 933 [47 Cal.Rptr.3d 420, 140 P.3d 736]; *People v. Ochoa* (1998) 19 Cal.4th 353, 408–409 [79 Cal.Rptr.2d 408, 966 P.2d 442], and cases cited; see generally Cal. Const., art. I, § 30, subd. (a) ["This Constitution shall not be construed by the courts to prohibit the joining of criminal cases as prescribed by the Legislature . . . ."].) Consistently with these principles, and because the statutory requirements for joinder under section 790(b) have been met, petitioner can establish error in the trial court's ruling allowing joint trial of the five charged offenses only by making a *"clear showing of prejudice* to establish that the trial court *abused its discretion* in denying . . . defendant's severance motion." (*Mendoza, supra,* 24 Cal.4th 130, 160, and cases cited, italics added; *People v. Kraft* (2000) 23 Cal.4th 978, 1030 [99 Cal.Rptr.2d 1, 5 P.3d 68] (*Kraft*); *People v. Marshall* (1997) 15 Cal.4th 1, 27 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*); see also *Poon, supra,* 125 Cal.App.3d at p. 69.)

A trial court's denial of a motion for severance of charged offenses amounts to a prejudicial abuse of discretion if the " 'trial court's ruling " 'falls outside the bounds of reason.' " ' " (*People v. Ramirez* (2006) 39 Cal.4th 398, 439 [46 Cal.Rptr.3d 677, 139 P.3d 64].) In making that assessment, we consider the record before the trial court when it made its ruling. (*Mendoza, supra,* 24 Cal.4th at p. 161.) "The factors to be considered are these: (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of

some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case." (*Ibid.*; see *People v. Zambrano, supra,* 41 Cal.4th 1082, 1128–1129 (*Zambrano*); *Ramirez, supra,* 39 Cal.4th 398, 439; *People v. Carter* (2005) 36 Cal.4th 1114, 1154 [32 Cal.Rptr.3d 759, 117 P.3d 476] (*Carter*); *People v. Sandoval* (1992) 4 Cal.4th 155, 172–173 [14 Cal.Rptr.2d 342, 841 P.2d 862]; *Kraft, supra,* 23 Cal.4th 978, 1030; *Marshall, supra,* 15 Cal.4th 1, 27–28.) "The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1284 [18 Cal.Rptr.2d 796, 850 P.2d 1] (*Cummings*); accord, *People v. Arias* (1996) 13 Cal.4th 92, 127 [51 Cal.Rptr.2d 770, 913 P.2d 980] (*Arias*).)

### A. *Cross-admissibility of the evidence in separate trials*

█ We frequently have observed that if evidence underlying the offenses in question would be "cross-admissible" in separate trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses. (*Carter, supra,* 36 Cal.4th 1114, 1154; *People v. Cunningham* (2001) 25 Cal.4th 926, 985 [108 Cal.Rptr.2d 291, 25 P.3d 519] (*Cunningham*); *People v. Bradford* (1997) 15 Cal.4th 1229, 1315–1316 [65 Cal.Rptr.2d 145, 939 P.2d 259], and cases cited.) Our cases, however, make it clear that complete (or so-called two-way) cross-admissibility is not required. In other words, it may be sufficient, for example, if evidence underlying charge "B" is admissible in the trial of charge "A"—even though evidence underlying charge "A" may not be similarly admissible in the trial of charge "B." (*Zambrano, supra,* 41 Cal.4th 1082, 1129; *Geier, supra,* 41 Cal.4th 555, 577–578; *Cunningham, supra,* 25 Cal.4th 926, 985; *Cummings, supra,* 4 Cal.4th 1233, 1284.) Our decisions also make clear that even the complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance. We repeatedly have found a trial court's denial of a motion to sever charged offenses to be a proper exercise of discretion *even when the evidence underlying the charges would not have been cross-admissible in separate trials.* (*People v. Bean* (1988) 46 Cal.3d 919, 936–940 [251 Cal.Rptr. 467, 760 P.2d 996] (*Bean*) [charges not cross-admissible on identity]; see also *Geier, supra,* 41 Cal.4th 555, 577 ["the absence of cross-admissibility alone would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion"]; *People v. Manriquez* (2005) 37 Cal.4th 547, 575–576 [36 Cal.Rptr.3d 340, 123 P.3d 614] [although cross-admissibility was not present, joinder was appropriate]; *Carter, supra,* 36 Cal.4th at p. 1154 [" ' " 'we have never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice' " ' "]; *Bradford, supra,* 15 Cal.4th at p. 1317 ["even *had* defendant

demonstrated that the evidence would not have been cross-admissible, he has failed to establish prejudice"]; *Arias, supra*, 13 Cal.4th 92, 127 ["joinder is often permissible even when cross-admissibility is not present"]; *People v. Mason* (1991) 52 Cal.3d 909, 934 [277 Cal.Rptr. 166, 802 P.2d 950] [assuming that one murder charge was not cross-admissible as to four other murder charges, but finding no abuse of trial court's discretion in failing to sever]; accord, § 954.1, quoted *ante*, fn. 10.)

As explained in *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757] (*Ewoldt*)—a case in which we addressed the issue of admissibility of *uncharged* crimes, rather than, as here, the issue of whether *charged* crimes should have been severed from a joint trial[11]—there exists a hierarchy, or continuum, with respect to the degree of similarity that is needed for cross-admissibility, depending upon the purpose (see Evid. Code, § 1101, subd. (b))[12] for which introduction of the evidence is sought. We observed: *"The least degree of similarity . . . is required in order to prove intent. . . .* In order to be admissible [for that purpose], the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably

---

[11] Decisions such as *Ewoldt* are relevant to the analysis governing admissibility, but both the burden of proof relating to admissibility and the assessment of prejudice are different in the context of properly joined *charged* offenses. In the situation of uncharged offenses, the People have the burden of establishing admissibility. (*Bean, supra*, 46 Cal.3d 919, 938.) In the situation of charged offenses that are properly joined, however, "[t]he burden is reversed" and rests with the party who seeks severance—the defendant. (*Id.*, at pp. 938–939.) Similarly, although in the context of evidence of *uncharged* offenses offered at trial, a court conducts an assessment concerning prejudice under Evidence Code section 352 (see, e.g., *Ewoldt, supra*, 7 Cal.4th 380, 404–405 [" 'uncharged offenses are admissible only if they have *substantial* probative value' "]), by contrast, in the context of properly joined offenses, "a party seeking severance must make a *stronger* showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial" (*Arias, supra*, 13 Cal.4th 92, 127, italics added). In the context of properly joined offenses, we assess potential prejudice not under Evidence Code section 352, but instead in the context of the traditional four factors outlined above: cross-admissibility of charges; tendency of the charges to inflame the jury; the bolstering of a weak case; and the conversion of noncapital charges into a capital case.

[12] Evidence Code section 1101 provides: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

harbor[ed] the same intent in each instance." [Citations.]' [Citation.]" (*Ewoldt, supra*, 7 Cal.4th at p. 402, italics added.)[13]

Petitioner asserts in his opening brief that only identity, and not intent, is at issue in these proceedings. Certainly, identity is one of the matters in dispute, but it is not the only one. As the People observe, at petitioner's first trial he argued that the evidence was insufficient to support a finding of deliberate and premeditated first degree murder. (*Alcala I, supra*, 36 Cal.3d 604, 625–627.) Similarly, at the second trial, the prosecution pursued a theory of first degree, premeditated murder and therefore bore the burden of proving, beyond a reasonable doubt, that petitioner acted with the specific intent to kill, and with premeditation and deliberation. The prosecution, of course, must prove each element of its case. Petitioner's assertion that his defense to the Robin Samsoe murder in the pending retrial will focus upon identity, and not intent, does not eliminate the prosecution's burden. Moreover, although in his reply brief petitioner challenges the People's cross-admissibility analysis, he does not contest that the mental state for murder is likely to be at issue in his retrial for the murder of Robin Samsoe. As explained below, it appears that evidence underlying all four of the Los Angeles charges would be relevant, at a separate trial on the Samsoe charges, on the issue of petitioner's intent in killing Robin Samsoe, and that such evidence would be cross-admissible for that purpose at a separate trial on those charges.

■ As we noted in *Ewoldt, supra*, 7 Cal.4th 380, " '[t]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state,

---

[13] We contrasted this with the degree of similarity needed to demonstrate two other matters—"common design or plan" and identity: "*A greater degree of similarity is required in order to prove the existence of a common design or plan.* [When offered for that purpose], evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' (2 Wigmore, [Evidence] (Chadbourn rev. ed. 1979) § 304, p. 249, italics omitted.) '[T]he difference between requiring similarity, for acts negativing innocent intent, and requiring common features indicating common design, for acts showing design, is a difference of degree rather than of kind; for to be similar involves having common features, and to have common features is merely to have a high degree of similarity.' (*Id.,* at pp. 250–251, italics omitted; see also 1 McCormick[ on Evidence (4th ed. 1992)], § 190, p. 805.) [¶] To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . [¶] *The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity.* For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. (*People v. Miller* [(1990)] 50 Cal.3d 954, 987 [269 Cal.Rptr. 492, 790 P.2d 1289].) 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' (1 McCormick, *supra*, § 190, pp. 801–803.)" (*Ewoldt, supra*, 7 Cal.4th 380, 402–403, italics added.)

and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' " (*Id.*, at p. 402, quoting 2 Wigmore, Evidence (Chadbourn rev. ed 1979) § 302, p. 241; see also *People v. Rogers* (2006) 39 Cal.4th 826, 853 [48 Cal.Rptr.3d 1, 141 P.3d 135]; *People v. Robbins* (1988) 45 Cal.3d 867, 879–880 [248 Cal.Rptr. 172, 755 P.2d 355], and authorities cited.)

■ The evidence underlying the Orange County and Los Angeles County charges supports a conclusion, by a preponderance of the evidence, that petitioner was the perpetrator in each,[14] and the factual similarities among the charges tend to demonstrate that, in each instance, the perpetrator harbored the intent to kill and the homicides were premeditated. As we observed earlier in our discussion (*ante*, at pp. 1218–1220) concerning the existence of common elements of substantial importance supporting a finding that the five charged murders are "connected together in their commission" under section 790(b), various similar features are present. Each of the victims was a young, single Caucasian female; all of the homicides involved blunt-force facial trauma and occurred within a 19-month period; and the bodies of all of the victims were discovered unclothed, or nude from the waist down. In addition, all of the offenses appear to involve a sexually sadistic motive. Each of the Los Angeles County victims was sexually assaulted and, although Robin Samsoe's body was too decomposed to permit a determination whether she had been sexually assaulted, the evidence—including the photographs that petitioner took of other bikini-clad young women at the same general time and location of Robin's disappearance, Robin's unclothed remains, and the testimony of jail inmates concerning petitioner's comments about Robin, including a prurient description of her body—indicates she was abducted for a sexual purpose.

---

[14] As explained in *People v. Carpenter* (1997) 15 Cal.4th 312 [63 Cal.Rptr.2d 1, 935 P.2d 708], a jury may consider properly admissible "other crimes" evidence so long as it finds "by a preponderance of the evidence" that the defendant committed those other crimes. (*Id.,* at pp. 380–383; see also Judicial Council of Cal. Crim. Jury Instns. (2007–2008) No. 375.) That standard is clearly met with respect to the Robin Samsoe charges and the four Los Angeles charges. Evidence linking petitioner to the Robin Samsoe charges includes the following: He was seen photographing Samsoe on the afternoon she disappeared; Dana Crappa testified that later the same day she saw, in a mountainous area near where Samsoe's remains subsequently were discovered, a Datsun F10 automobile and a dark-haired man who resembled petitioner, pushing or "forcefully steering" a blond-haired girl toward a dry stream bed; petitioner's Datsun F10 automobile was parked at his residence when he was arrested; and earrings identified by Robin Samsoe's mother as having often been worn by Robin were found in a pouch in petitioner's Seattle storage locker—along with another earring containing the DNA of a separate homicide victim, Charlotte Lamb, to whom petitioner was linked by his own DNA left at the scene of that homicide. Evidence linking petitioner to the four Los Angeles County charges includes forensic evidence tying petitioner to each of those homicide victims, as well as eyewitness evidence connecting him to one of those victims.

Petitioner focuses upon differences between the Orange County charge and the Los Angeles County charges. He stresses that (1) all of the Los Angeles County victims were young adults, whereas Robin was 12 years of age; (2) most of the Los Angeles County victims (all except Barcomb, who was found in a canyon) were found indoors, whereas Robin's body was discovered on a remote hillside; (3) all of the Los Angeles County victims exhibited physical evidence of sexual assault, whereas Robin's body, which was decomposed, revealed no such evidence; and (4) when discovered, most if not all of the Los Angeles County victims appeared to have been posed, whereas there is no evidence that Robin's body, which may have been disturbed by wild animals, was left in a posed position.

 As the People observe, we addressed a similar situation in *Kraft, supra,* 23 Cal.4th 978, a case in which we considered the admission of evidence to prove "common scheme or plan"—a category of evidence that, as we explained in *Ewoldt, supra,* 7 Cal.4th 380, 402–403, falls between the strict similarity requirements for evidence offered to prove identity, and the more lenient similarity requirements for evidence offered to prove intent. (See *ante,* fn. 13.) In *Kraft,* the defendant argued that the trial court abused its discretion in failing to sever 16 charged murder counts and try them separately. Our discussion in *Kraft* makes it clear that, even with respect to the comparatively higher degree of similarity required for the use of other-crimes evidence to establish "common scheme or plan," the standard can be met despite the existence of some factual differences between or among the charged offenses. Specifically, we held it sufficient that "most" of the 16 charged murders shared substantial similarities, and that evidence underlying those 16 charged murders "generally" would have been admissible at separate trials.[15] We then noted that, " '[u]nlike evidence of uncharged acts . . . to

---

[15] We observed: "In denying the severance motion, the trial court in this case noted *most* of the evidence on the various charges would be cross-admissible. Defendant disputes that conclusion. We find his arguments unpersuasive. In a trial on each individual murder count, evidence of the other charged murders *generally* would have been admissible to show defendant committed the charged murder as part of a common scheme or plan, which was relevant to the element of intent. (Evid. Code, § 1101, subd. (b); Pen. Code, § 187.) The victims shared certain characteristics, all being White males between the ages of 18 and 25, all but one being single, and *most* being, at the time of the offense, vulnerable by virtue of lack of transportation. The method of obtaining control over the victims was similar in *most* of the charged offenses: Defendant *generally* supplied the victims with alcohol and drugs, often diazepam, to the point they could no longer resist, whereupon defendant *generally* bound their wrists with ligatures, frequently using shoelaces. After gaining control over the victims in such a manner, unless they were already succumbing from the effects of the drugs, defendant killed them, *often* by ligature strangulation. After the victims' deaths, defendant disposed of the bodies *generally* by dumping them from his car, *usually* on or near a freeway or other roadway. And each murder involved some type of arguably sexual activity or aberration, whether taking the form of sodomy, mutilation or stripping the victim of clothing." (*Kraft, supra,* 23 Cal.4th at pp. 1030–1031, italics added.)

prove identity,' " evidence designed to prove a common scheme or plan " 'need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense.' " (*Kraft, supra,* 23 Cal.4th at p. 1031, quoting *Ewoldt, supra,* 7 Cal.4th at p. 403.)[16]

Our accommodating analysis in *Kraft,* concerning the similarity required in order to prove the existence of a common scheme or plan, applies all the more to the use, in the present case, of other charged crimes in order to prove intent—which, as noted, requires an even lesser degree of similarity among the offenses. We conclude that the evidence linking petitioner to all five charges—and underlying each of those charges—satisfies the standard we articulated in *Ewoldt, supra,* 7 Cal.4th 380: It "support[s] the inference that the [perpetrator] ' "probably harbor[ed] the same intent in each instance." ' " (*Id.,* at p. 402.) Accordingly, based upon information available to us at this stage of the proceedings, it appears that the evidence underlying the four Los Angeles County charges would be relevant at a separate retrial of the Robin Samsoe case to demonstrate the mental states of premeditation and deliberation required for murder, and that such evidence would be cross-admissible for that purpose at a separate trial on the Samsoe charges.[17]

---

[16] In upholding the trial court's refusal to sever the 16 murder charges from each other, we rejected the defendant's contention that "the evidence in each charged murder had to be so similar as to establish a distinctive 'signature' for cross-admissibility under the common plan theory pursuant to Evidence Code section 1101, subdivision (b)." We reiterated our holding in *Ewoldt, supra,* 7 Cal.4th 380, 403, that "a lesser degree of similarity is necessary to admit evidence of other offenses to prove a common design or plan than to prove identity." (*Kraft, supra,* 23 Cal.4th at pp. 1031–1032.)

[17] At this stage in the proceedings—prior to trial (joint or otherwise)—we cannot determine whether the Los Angeles County charges actually would be admissible at any separate trial on the Samsoe charges. In order to make that determination, a trial court would need to undertake an analysis, informed by evidence adduced or proffered at a separate (and theoretical) new trial of the Samsoe charges, focusing upon probative value versus prejudice under Evidence Code section 352. (See *ante,* fn. 11.) That form of section 352 analysis, however, cannot be undertaken by an appellate court at the present stage of the proceedings, because we do not *know* what evidence would be adduced at a separate trial; we can only assume that the evidence would be similar to that presented in the prior Samsoe trials, and to the information concerning the Los Angeles County charges presented to the grand jury. Nevertheless, that limited information is sufficient to allow us to make an assessment concerning cross-admissibility, for purposes of severance analysis. As noted earlier, the party seeking severance of properly joined charges bears the burden of establishing that the trial court abused its discretion in declining to sever charges for trial. Petitioner "must make a *stronger* showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial." (*Arias, supra,* 13 Cal.4th 92, 127, italics added.) In light of the defendant's burden and the strong preference for joinder of charges, as a general matter we find "cross-admissibility"—for purposes of severance analysis—so long as it appears, based upon the available information, that the evidence "would" be cross-admissible at a separate trial.

Finally, the circumstance whether the evidence, if admissible, might be admissible "the other way"—that is, whether the evidence underlying the Orange County charge could be admissible

In any event, as observed above, we have held in numerous cases that although a finding of cross-admissibility normally would be sufficient, standing alone, to justify a trial court's refusal to sever charged offenses, and to support a conclusion that the trial court did not abuse its discretion in refusing to sever the charges, even the absence of cross-admissibility would not establish that a trial court erred when, as here, the offenses have been properly joined by statute and none of the other three factors relevant to the severance issue demonstrates an abuse of the trial court's discretion. As explained below, we conclude that, with respect to the other three factors that we often consider in evaluating such requests, petitioner has failed to carry his burden of making the clear showing of prejudice required to establish that the trial court abused its discretion in declining to sever the five charges.

B. *Whether some of the charges are likely to unusually inflame the jury against defendant*

The sexual assaults and murders at issue in the Los Angeles County cases certainly are aggravated charges—but we conclude they are not "unusually likely to inflame" a jury that, in any event, properly will hear testimony concerning the abduction and brutal murder of Robin Samsoe, a vulnerable 12-year-old girl whose unclothed body was found with her face smashed in. The evidence underlying each of the five charges is "similar in nature and equally gruesome." (*Carter, supra,* 36 Cal.4th 1114, 1155.)

C. *Whether a weak case has been joined with a strong case or with another weak case so that the total evidence unfairly may alter the outcome of some or all of the charges*

The evidence underlying the four Los Angeles County murder charges—supported in three cases by DNA evidence, and in the fourth by serological evidence and eyewitness testimony connecting petitioner to victim Jill Parenteau less than one month prior to her murder (a crime that, as noted, occurred only a few days before Robin Samsoe disappeared)—clearly is strong. On the other hand, we doubt that the evidence in the Orange County case, even as it existed at the time of the first two trials, ever properly could be described as weak. (See *Alcala II, supra,* 4 Cal.4th 742, 755–764.) But

in each of the four Los Angeles County cases—would not be dispositive. As noted earlier, complete or " 'two-way' cross-admissibility is not required." (E.g., *Zambrano, supra,* 41 Cal.4th 1082, 1129.) In any event, petitioner's argument in favor of severance focuses exclusively upon the asserted undue influence of the Los Angeles County charges upon the Orange County case, and not vice versa.

now, pending the second retrial, in light of the discovery that another earring in petitioner's possession belonged to Los Angeles County victim Charlotte Lamb, the evidence underlying the Orange County charges also must be described as strong.

As the People observe, throughout the Samsoe proceedings there has been a recurring dispute concerning whether earrings found in a jewelry pouch in petitioner's Seattle storage locker belonged to Robin's mother, had been "trimmed" by her, and were worn by Robin at the time of her disappearance. Petitioner has claimed those earrings as his own, but the prosecution's expert testified that they exhibited a pattern of striations similar to those produced by nail clippers belonging to Robin's mother. This evidence, although disputed by a defense expert, supports an inference that petitioner took the earrings from Robin Samsoe and kept them as a trophy from her killing. More recently, pending retrial of the Orange County case, it was discovered that another earring in the same pouch contains DNA matching that of Los Angeles County victim Charlotte Lamb. The People assert: "This newly discovered fact makes the Lamb murder especially probative in the Samsoe case, insofar as it tends to show that the jewelry pouch was indeed a trophy" container, and hence further identifies petitioner as the person who killed Robin. The People continue: "The evidence is even more compelling [because] it shows that [petitioner] lied when he testified, and wrote in his book,[18] that all the jewelry found in the pouch was possessed for innocent reasons. . . . [T]his is highly probative evidence that has become a critical component of the prosecution's case on the Samsoe murder."

We agree that the Lamb earring evidence, which appears to significantly undermine petitioner's prior claims that the "Samsoe earrings" are his own and never belonged to Samsoe, is clearly relevant—and also appears to be cross-admissible for the same purpose at a separate trial on the Samsoe charges. (See *ante*, fn. 17.) Accordingly, it appears that the evidence of petitioner's guilt of the Samsoe charges is quite strong—and hence that a joint trial of all five changes would not unfairly merge weak and strong cases.

D. *Whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case*

The People argue that because the Samsoe case carries its own death-qualifying special-circumstance allegation (murder during the commission of kidnapping) and each of the four Los Angeles County charges also alleges several special circumstances, this case does not present a situation in which

---

[18] As observed by the Court of Appeal below, after his retrial, but prior to the DNA testing that linked him to the Lamb homicide, petitioner authored a book in which he "express[ed] his ownership of *all* the jewelry items found in the pouch." (Italics added.)

the prosecution seeks to "convert" a matter into a capital case; all five matters already are capital cases. (Cf. *Williams v. Superior Court* (1984) 36 Cal.3d 441, 454 [204 Cal.Rptr. 700, 683 P.2d 699] [a case in which "it is the joinder *itself* which gives rise to the special circumstances allegation of multiple murder"].) We agree.[19]

As we observed in *Arias, supra*, 13 Cal.4th 92, 127, "Because of the factors favoring joinder, a party seeking severance must make a stronger showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial." We conclude that petitioner has not carried his burden of making a "clear showing of prejudice" (*Mendoza, supra*, 24 Cal.4th 130, 160) to establish that the superior court abused its discretion in refusing to sever the five murder charges.

## V

The Court of Appeal concluded that trial should proceed on the Orange County charges, joined with two of the Los Angeles County charges (Lamb and Parenteau), but that the other two Los Angeles charges (Wixted and Barcomb) must be severed. In so concluding, the appellate court found that the latter two cases possess fewer "marks of similarity" compared with the three other charges, and it accepted petitioner's assertion that a single trial of all five murder charges, at which he would face the DNA and serological evidence described above, would be "potentially unfair."

We agree with the People that the appellate court's conclusion in this respect fails to accord proper deference to the exercise of discretion by the trial court and cannot be squared with the requirement that a petitioner challenging a trial court's refusal to sever properly joined charges has the burden of making a clear showing of prejudice resulting from the joinder. (See *People v. Balderas* (1985) 41 Cal.3d 144, 171 [222 Cal.Rptr. 184, 711 P.2d 480] [a "bald assertion" of prejudice is "not enough" to satisfy the defendant's burden].) As the People observe, "there is nothing unfair about the defendant facing an overwhelmingly high likelihood of conviction based on admissible evidence and permissible inferences."

---

[19] Although we suggested in *Williams* that when "one of the charged crimes is a capital offense, . . . the court must analyze the severance issue with a higher degree of scrutiny and care than is normally applied in a noncapital case" (*Williams v. Superior Court, supra*, 36 Cal.3d at p. 454), the subsequent enactment of section 790(b)—which, as noted, specifically provides for joinder of *capital* cases such as these—makes it clear that such a heightened analysis is no longer called for.

## VI

The judgment of the Court of Appeal is reversed. A single trial on all five murder charges may proceed in Orange County.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

On June 18, 2008, the opinion was modified to read as printed above.