Filed 3/18/16  P. v. Muhammad CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066995 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. Nos. SCD250279 and SCD250095) |
| KAREEM MUHAMMAD, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge.  Affirmed as modified.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Heidi Salerno, Deputy Attorneys General, for Defendant and Appellant.

INTRODUCTION

A jury convicted Kareem Muhammad of attempted robbery (Pen. Code,[1] §§ 211 & 664; count 1), pandering by procuring (§ 266i; count 2), and pimping (§ 266h, subd. (a); count 3).[2] In a bifurcated proceeding, the court found true the allegation Muhammad had a first serious felony prior and a strike prior for an attempted robbery conviction. The court sentenced him to an aggregate term of 14 years and four months. The court used count 2 as the principal term and sentenced Muhammad to eight years (double the middle term) plus a consecutive term of one year and four months (one-third the middle term of eight months doubled) for count 1 and five years for the serious felony enhancement. The punishment for count 3 (the middle term of eight years) was stayed pursuant to section 654. The court ordered restitution and imposed various fines and fees, including a $39 theft fine and assessment pursuant to section 1202.5.

On appeal, Muhammad contends (1) the court erred in consolidating the attempted robbery case with the pimping, pandering, and procuring case resulting in a denial of his right to due process; (2) the court improperly denied his motion for self-representation; and (3) the theft fine and assessment should be stricken as unauthorized by law. We find no merit in the first two contentions. However, because the People concede the third

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] The court granted Muhammad's motion for judgment of acquittal pursuant to section 1118.1 as to the human trafficking charge (§ 236.1, subd. (b); count 4) at the close of the prosecution's case.

2

contention, we modify the judgment by striking the $39 fine under section 1202.5. In all other respects, we affirm the judgment.

FACTUAL BACKGROUND

A

*Attempted Robbery Evidence*

Around 8:45 p.m. on July 15, 2013, the manager at the Radio Shack store on Balboa Avenue in San Diego noticed a Dodge Magnum vehicle with no license plate, pull backwards into a parking space near the store. An African-American male came into the store with a white shirt over his head and face, approached a sales associate who was assisting a customer and said, "This is a robbery. Everyone to the back." Working phones or phones of value are kept in a locked room in the back of the store. As the customer struggled with the man, the man pointed something at the customer and said he was going to kill him. The sales associate put his hands in the air and walked to the back of the store where the store manager had the door open. The store manager and sales associate ran out the emergency exit to a nearby restaurant where they called 911. The customer jumped away from the man and ran out of the front door of the store as the man went to the back of the store where he tried to enter a back room. The jury was shown a store surveillance video of the incident.

A witness and his fiancée were walking out of a nearby store when the customer came riding a bicycle toward them saying the Radio Shack had been robbed. The witness said a tall, slender, "possibly a [B]lack male" with a shirt over his head and face got into a silver Chrysler or Dodge station wagon and sped away. The customer looked back and

3

also saw the Black male exit the store in a crouched position, jump into the silver car and take off. The witness called 911 and waited for the police. The witness and the customer reported the vehicle had been parked in front of the Radio Shack store and had no license plate. They did not see anyone else in the car.

San Diego Police Detective James Brown investigated the case. He collected video footage from a nearby jewelry store showing the strip mall parking lot as well as video footage from the Radio Shack store. He also spoke with the store employees and the two other witnesses. Detective Brown created a flier with the vehicle description, synopsis of the crime and some surveillance footage photographs. He distributed this flier to patrol officers and other law enforcement agencies.

A couple of weeks later, on August 8, 2013, San Diego Police Detective Kate Allison, who worked in the vice division, interviewed Akila Lyles. Lyles told Allison that Muhammad was involved in a robbery of a Radio Shack in Clairemont Mesa at Genesee and Balboa Avenues where he tried to obtain phones to sell. Lyles said an older White male with gray hair, who had a bicycle parked outside, was in the store purchasing something when Muhammad went into the store with a BB gun and a white T-shirt wrapped over his face. She said the customer wrestled with Muhammad in the store. Lyles said she was lying in the vehicle, a Dodge Magnum, which was parked across from the Radio Shack store with no license plate.

Around the same time, detectives in the vice division saw Detective Brown's flier and sent him an e-mail stating they had contacted a couple of brothers at the Premier Inn motel who owned that type of car and one of them may have been responsible for the

4

robbery. Detective Allison did a Facebook search and located photographs of the vehicle with Muhammad. After comparing the Facebook photographs with those in the surveillance video, Detective Brown concluded they were the same vehicle. Detective Brown assisted Detective Allison in a vice operation on August 14, 2013, in which Lyles and Muhammad were arrested along with Teresa Willis and Muhammad's brother, Elijah.[3]

B

*Pandering/Pimping Evidence*

1

Eric Drilling, a vice detective with the San Diego Police Department, became aware of Willis when she was arrested for prostitution while she was underage. She has been arrested several times for prostitution.

Willis came to Detective Drilling's attention again in June 2013 when he learned she was posting advertisements online as an escort. She was apparently working for Elijah. Detective Drilling gave the information to Detective Allison because she handled vice operations involving adult victims. A detective located an online advertisement for Willis and, using a phone number associated with Elijah, arranged a date with her at the Premier Inns motel on June 5, 2013.

---

[3]	Because Muhammad and his brother share a surname, we refer to the brother by his first name. No disrespect is intended.

A clerk at the Premier Inns testified a woman came to the motel on June 5, 2013, and asked for two rooms. When the clerk advised her the motel required separate identification for each individual room, the women returned with Willis. They obtained two rooms.

Detective Allison talked with the motel clerk later that night. He gave her the two room numbers and indicated people were going in and out of the rooms. Police officers were stationed in the parking lot to watch the outside of the rooms while Detective Allison and another detective set up inside a room next to one of the target rooms. The officers observed two males, later identified as Muhammad and Elijah, going back and forth between the rooms. Muhammad left with another female in a Dodge Magnum station wagon.

When an undercover detective obtained an agreement with Willis to trade a sex act for money and she engaged in conduct in furtherance of such an act, Detective Allison and other officers entered the room and arrested Willis for prostitution. Lyles and Elijah were contacted in the other room and Elijah was arrested for pimping.

2

After the arrest, the detectives seized Willis's phone. A text message to Muhammad's contact number indicated she had a date and it was going to be "350 for both." Muhammad's response was "when and where?" She responded "On the bay." Muhammad then said, "You have a date on the way." In another message Muhammad wrote, "This [Muhammad]. The other trick ready at Comfort Inn." In another series of messages, Willis asked for an address and he responded with the address for the Mission

6

Valley Resort on Hotel Circle South.  In another message Willis said, "Tell her to hurry up, pimp."  In another message Willis said, "Tell Elijah our rooms are booked" with directions to a hotel.

In a message to Lyles, Willis said "Tell Elijah to take me to the track," which is an area where prostitutes walk a street, typically along El Cajon Boulevard in San Diego. Other messages from Willis to Elijah discuss arrangements for dates for various amounts, posting ads, and getting rooms.  In one message Willis wrote, "We're good.  The other guy didn't come so we got $1200 for both of us.  But he has more money though."  In response, Elijah wrote, "Get it all, baby.  Get it all."  In another exchange with Elijah, Willis posted a photograph with a saying, "I love my pimp."

3

A video posted on Willis's Facebook page showed Muhammad talking about how he was a pimp and how women do not work as hard as they used to.  He started by saying, "These hoes these days … they don't do shit. … They lay on they back and they say, 'I got a boyfriend.'  [¶] … But it's like, where's your boyfriend when you're on the side of the freeway? …Where is your boyfriend at when you need something?  When you're working at Carl's Junior and ain't got shit for yourself."  He then said, "[B]ut when you fucking with a pimp like me, I'm gonna make sure you invent your lifestyle. … 'Cause a nigger like me, I been through nine hoes in ten days. … A nigger like me, man, I'm gonna make sure a bitch look a whole lot better leaving then she did coming. … 'Cause … nowadays, bitches ain't shit. … I have been through all types of bitches. … But back in the day, a bitch said the right thing.  The bitch say, you know … I mean, don't

7

drop me off—just kick me out the car. … But nowadays, the bitches want to lay on the bed. … [A]nd saying', you know, I'm mad. [¶] … cuz I didn't get no calls."  He went on, "The car note is due … [¶] … and it's gonna get paid . . . .  But a bitch nowadays, just want to hope on a star.  So, I'm saying', oh, man the bills are gonna be paid. … [¶] … Bitches don't got no hustle about they self, man."  He stated, "That's the reason why I refused to have a girlfriend. … [C]uz every last one of them hoes is paying me something."  "I'm a pimp man … I just refuse to have a bitch not give me something … you see what I'm saying' … [¶] … a bitch better not come back from the grocery store without some change … [¶] … without some bread."

Willis was shown in the video with a tattoo of a crown and the word Elijah near it, which she obtained shortly before the June 5, 2013 arrest.  Muhammad referred to Willis saying, "And you're fucking my twin brother. … Now you got the tattoo … [¶] You see what I'm sayin', man.  That's the whole thing. … It's loyalty."[4]

Muhammad recalled a woman they referred to as Treasures who "was the best hoe all three of us had. [¶] … [C]uz … she wouldn't even ask for a meal … [¶] … cuz the bitch just wanted to keep making more money."  "But nowadays, you know what I mean.  You'll never find another hoe like that. … All three of you ho's ain't nothing like what we used to have back in the days. [¶] . . . [¶] … But the thing is … [¶] … we're nice pimps.  You see what I'm sayin' but the thing is the hoes can't respect that.  You see what I'm

---

4      Detective Drilling testified it is common for prostitutes to get tattoos of crowns with their pimp's name in or around the crown as a form of branding or showing loyalty to a pimp.

sayin'—like this one—this right here is—mama star right there though. We make White girl money out of her. [¶] … This right here—see what I'm sayin' is a Oreo cookie. You see what I'm sayin' and we make chocolate."

4

In August 2013 the vice department located an advertisement from Willis for services in Arizona. Two detectives contacted Willis posing as johns. They discussed trading money for sex and she quoted a rate. To one she quoted an extra fee if he wanted anal sex. She provided an address of a motel in Arizona. Sheriff's deputies in Arizona conducted surveillance of a motel for nearly two hours where two rooms were rented by Willis and Muhammad. They observed Muhammad walking back and forth between the rooms with a laptop computer and talking on a cellular phone. When Elijah and Willis left the motel, the officers made a traffic stop to identify them and then provided the information to Detective Allison.

5

Around the time the vice officers found the Arizona advertisements, a parole officer contacted Detective Allison and said someone reported Muhammad and Elijah were in Arizona. Using the number provided, Detective Allison contacted Lyles on August 8, 2013, and arranged to meet with her.

Lyles told Detective Allison she met Muhammad and Elijah through Willis. Lyles said Muhammad was her pimp and Elijah was Willis's pimp, but they all worked together. Lyles said she gave Muhammad the money from her dates. Once she tried hiding money in a condom, which she placed inside her vagina, but Muhammad grabbed

her out of the shower and tried to remove it.  When she refused to give it to him, he held onto her until she relented.  Muhammad posted advertisements for Lyles and he would sit in the car as protection while she walked the track.

Lyles and Detective Allison discussed the night at the Premier Inns motel.  Lyles said she was working and Muhammad and Elijah moved from room to room as she and other women got dates.  Muhammad left the motel with another girl who also worked with him at the time.

Lyles was upset because Muhammad went to Arizona without her because she had some female health problems.  She showed Detective Allison a tattoo she recently obtained with a crown and the name Kareem, which she said stood for King Kareem.  After the first interview, Detective Allison called back to confirm which motel they had used the night before.  At the end of the conversation, Lyles said she forgot to mention Muhammad had done a robbery.  Detective Allison returned to talk to Lyles about the robbery, as discussed above.

6

On August 14, 2013, detectives from the vice department used telephone numbers from online advertisements to arrange for a meeting between Willis, Lyles, and an undercover detective at a motel room in the Clairemont Mesa area.  When Willis and Lyles arrived at the room, they confirmed with the undercover detective the types of sex acts they were willing to perform and the price they would accept per person.  Both women accepted alcohol and condoms.  When the detective felt he had negotiated the act

10

of prostitution with both women, he gave a predetermined bust signal and they were both taken into custody.

Muhammad and Elijah were stopped in a parking lot next to the motel and they were placed into a patrol vehicle, which was equipped with a recorder. At Detective Brown's instruction, another detective informed Muhammad of the charges. When Muhammad was told he was under arrest for robbery, he asked, "Is it robbery or attempted robbery?" to which Elijah responded, "Shhh." Muhammad later asked, "Robbery, …, so I'm actually charged with robbery?"

C

After Muhammad's arrest, he made a number of calls to Lyles from jail. After Lyles told him she received a subpoena for his preliminary hearing, Muhammad said she needed to help him by calling the district attorney to say she was coerced or drunk. He said if she did not come to court they would dismiss the case and he told her to leave town. Muhammad asked Lyles if the police talked about the "Clairemont shit" when they interviewed her in the motel and he told her they were going to try to incriminate her. Muhammad said they needed to "come up with a plan" and told her to "plead the [F]ifth" so she would not incriminate herself. He told her to say she was drunk or did not remember.

The following day Muhammad asked, "when they came and talked to you that first time, when they started talking to you about the Clairemont shit, did they ask you were you … in the car during the robbery?" Lyles said she told the police she drove around with Muhammad everywhere. He again encouraged her to plead the Fifth. Lyles said

11

Muhammad's mother told her to say she was drunk or did not remember because she was so drunk.  In later calls, Muhammad asked Lyles if the police showed her pictures of him without a mask.  He again told her he needed to get the case dismissed at the preliminary hearing and she needed to plead the Fifth.

Muhammad also told Lyles to pawn a laptop, "go online … and trick people."  He told her to use the money from the laptop to get a room, put up some advertisements and get someone to handle the phone for them.  When Lyles said she had no support and no place to stay, he said, "you guys gotta get a hotel, and you guys gotta start actually giggin'."

At trial, Lyles said she was drunk during her interviews with Detective Allison.  She denied being in the car during the attempted robbery and said she made up the story based on information she learned from the Internet and another person.  She said she wanted to get Muhammad in trouble for leaving her when he went to Arizona.  Detective Allison testified Lyle did not appear to be under the influence of alcohol or drugs during the interviews.

DISCUSSION

I

*Severance Motion*

A

The People moved to consolidate the attempted robbery case with the pimping, pandering, and human trafficking case pursuant to section 954.  The court determined the cases were connected together in their commission noting there is an element of coercion

12

or force in both the attempted robbery and in the pimping, pandering and human trafficking. The court also noted there was cross-admissibility of evidence. The court did not agree with defense counsel's argument of substantial prejudice or that one case would be unduly prejudicial to the other. The court stated the prejudicial impact essentially went both ways and resulted in a wash. The court granted the motion to consolidate as to Muhammad, but severed the case as to Elijah. The People filed a consolidated information against Muhammad designating the pimping and pandering case as the lead case.

At a subsequent hearing, defense counsel moved to reconsider the consolidation arguing the videotape of Muhammad discussing pimping would significantly change the pimping and pandering charges and would prejudice the jury in considering the attempted robbery charges. Counsel argued the attempted robbery charges were weak whereas the video could be fairly considered to be a confession to pimping and pandering. The court denied the motion to reverse the consolidation order stating the cases were joined in their commission.

B

" 'The law favors the joinder of counts because such a course of action promotes efficiency.' [Citation.] Section 954 provides that '[a]n accusatory pleading may charge two or more different offenses connected together in their commission … or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated.' Even where the statutory requirements for joinder are

13

satisfied, however, 'a trial court has discretion to order that properly joined charges be tried separately.' " (*People v. Scott* (2015) 61 Cal.4th 363, 395.) "To succeed on a claim that the trial court abused its discretion in denying severance or ordering consolidation, the defendant must make a ' "clear showing of prejudice" ' and establish that the ruling fell ' " ' " 'outside the bounds of reason.' " ' " ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 37 (*Merriman*).)

"The phrase regarding offenses 'connected together in their commission' under section 954 includes offenses that share a common element." (*People v. Leney* (1989) 213 Cal.App.3d 265, 269.) This provision of section 954 " 'permits the joinder of different offenses not related to the same transaction or event "*if there is a common element of substantial importance in their commission*, for the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant." ' " (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1218; see *People v. Leney, supra,* at p. 269 [use of a defendant's home to commit a crime or commission of crimes against similar individuals is a common element].)

In exercising its discretion, the trial court takes into account relative factors such as " ' "whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case." [Citation.] "[I]f evidence underlying the offenses in question would be 'cross-admissible' in separate

14

trials of other charges, that circumstance normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 469-470; *Merriman*, *supra*, 60 Cal.4th at p. 38.)

In this case, the attempted robbery offense was committed during the same two-month window of time as the pimping and pandering charges. Lyles was a witness for all of the offenses. Her presence at the scene of the attempted robbery, her disclosure to the police regarding the attempted robbery, and her subsequent recantation was explained by her relationship to Muhammad and the pimping and prostitution activities. Her testimony, including the impeachment evidence of how her stories changed after receiving the jail calls, was cross-admissible. We also note witnesses' descriptions of the vehicle Muhammad used in June at the Premier Inns motel matched the descriptions of the vehicle used in the July attempted robbery offense. At the time of the hearing, the trial court noted a common element of coercion runs through the pimping, pandering and human trafficking charges, which is similar to attempted robbery with a gun. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 160 [crimes committed close in time with a common " ' "element of intent to feloniously obtain property" ' " are connected in their commission].) The fact the People did not ultimately prove the human trafficking charge at trial does not mean the trial court abused its discretion when it granted the motion to consolidate. "An appellate court evaluates such claims in light of the showings made and the facts known by the trial court at the time of the court's ruling." (*Merriman, supra,* 60 Cal.4th at p. 37.)

15

Even if evidence had not been cross-admissible, severance was not required because the factors weighing in favor of severance—converting the charges into a capital offense, unduly inflaming the jury, and bolstering a weak case with a strong case—were either absent or inconsequential. (*People v. Scott*, *supra*, 52 Cal.4th at p. 473; *People v. Soper* (2009) 45 Cal.4th 759, 779-780 [absence of cross-admissibility by itself is not sufficient to establish abuse of discretion in denying severance motion; reviewing court must consider and weigh the other three factors as well].) The joinder of the attempted robbery charge with the pimping, pandering and human trafficking charges did not convert the matter into a capital case, the evidentiary support for each case was similarly strong, and the evidence related to one case was not more inflammatory than the evidence related to the other case. Muhammad's counsel described the pimping and pandering charges as dealing with the "seedy side of life" and the burglary charge as dealing with "more of a violent side." As the trial court observed, "attempted robberies are upsetting to the people involved. And … whatever social reaction there may be to the pimping and pandering and human trafficking … it's sort of a wash …. You can argue prejudice supposedly both ways. But I don't think it rises to the level of a substantial probability of unfair, undue prejudice." We agree and conclude the court did not abuse its discretion in granting the motion to consolidate or in denying Muhammad's subsequent request to sever.

II

*Motion for Self-Representation*

A

On the day set for trial, Muhammad made a motion to represent himself. Muhammad indicated he was not ready for trial and if the court were to grant his motion to represent himself he would need an additional 30 to 45 days to prepare. He stated he had a great relationship with his attorney and was not "totally dissatisfied." However, he said he wanted to handle the trial differently. Muhammad argued his attorney did not oppose the motion for consolidation. The court disagreed, noting his counsel had argued against consolidation twice. After discussing the status of the defense investigation efforts, the court denied the motion for self-representation as untimely.

B

"A trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently." (*People v. Lynch* (2010) 50 Cal.4th 693, 721 (*Lynch*).) However, " 'the right of self-representation is not absolute.' " (*Ibid*.) "[A] self-representation motion may be denied if untimely." (*Id.* at p. 722.)

Courts have held requests to waive counsel made on the day of trial, or even days before trial, are untimely. (*Lynch, supra,* 50 Cal.4th at pp. 722, 726 [motions for self-representation made days before trial in complex case properly denied as untimely]; *People v. Valdez* (2004) 32 Cal.4th 73, 102 [motion made "moments before jury selection

was set to begin" was untimely].)  Denial of such tardy requests is necessary "to avoid unjustifiable delay or disruption of orderly court proceedings."  (*People v. Ruiz* (1983) 142 Cal.App.3d 780, 791.)

" ' "When a motion for self-representation is not made in a timely fashion prior to trial, self-representation no longer is a matter of right but is subject to the trial court's discretion."  [Citation.]  In exercising this discretion, the trial court should consider factors such as " 'the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' " ' "  (*People v. Valdez*, *supra*, 32 Cal.4th at p. 103.)  In other words, the "trial court may consider the totality of the circumstances in determining whether a defendant's pretrial motion for self-representation is timely."  (*Lynch*, *supra*, 50 Cal.4th at p. 726.)

In this case, Muhammad made the motion to represent himself on the day of trial. Although he stated he discussed self-representation with his first attorney, he made no such prior motion to the court.  When the two cases were filed against him, he requested Gloria Collins to represent him on both matters and agreed to continue the preliminary hearing to allow for her appointment.

When the court asked him to explain why he thought it was in his best interest to represent himself, Muhammad stated his attorney "is a great person.  We have a difference of opinion on this case on the way that it should go."  When asked why he

needed 45 more days to prepare for trial, Muhammad stated he wanted to do more legal research, even though he said he understood the law.

The court heard statements from both Muhammad and his attorney regarding consolidation as well as trial preparation and discovery. The court noted it allowed defense counsel more time after discovery of the video to prepare for trial. It discussed its understanding of investigations undertaken by Muhammad's attorney and stated it would consider giving more time to contact additional witnesses, if it became necessary. However, the court concluded by stating, "Ms. Collins has been working very diligently on your behalf, Mr. Muhammad. You haven't given me any reason to think that I should relieve her, and your motion to represent yourself is not timely." "There is no trailing your case. … Ms. Collins is doing the very best she can to represent you to the best of her ability, and your motion is simply not timely."

After the court made its ruling, Muhammad asked for an additional week, which the court denied. Thereafter, when the court observed Muhammad refused to dress out on the first morning of trial, Muhammad stated he thought the court was going to allow him to represent himself. The court stated it was not going to "stand still for any more manipulation." We conclude the trial court properly denied the motion for self-representation as untimely based on the totality of the circumstances.

## III

### *Section 1202.5 Fine and Assessment*

Muhammad contends, and the People concede, the $39 fine imposed pursuant to section 1202.5 should be stricken as unauthorized by law. (*People v. Mancebo* (2002) 27

19

Cal.4th 735, 758.) Section 1202.5 provides for the imposition of a fine of $10 in addition other penalty or fine assessments upon conviction for certain theft offenses "enumerated in Section 211 [robbery], 215 [carjacking], 459 [burglary], 470 [forgery], 484 [theft], 487 [grand theft], subdivision (a) of Section 487a [theft of livestock], or Section 488 [petty theft] or 594 [vandalism]." The statute does not list attempted crimes, such as attempted robbery, in the offenses subject to the statute. As such, we modify the judgment to strike the $39 fine. (*People v. Smith* (2001) 24 Cal.4th 849, 854.)

DISPOSITION

The judgment is modified by striking the $39 fine under section 1202.5 from the judgment. The trial court is directed to modify the abstract of judgment accordingly and to forward an amended abstract to the Department of Corrections and Rehabilitation. The judgment is affirmed as modified.

McCONNELL, P. J.

WE CONCUR:

BENKE, J.

O'ROURKE, J.