Filed 6/23/21  P. v. Thornton CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088796 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE023148) |
| v. | |
| CHRISTOPHER THORNTON, | |
| Defendant and Appellant. | |

This case is primarily about joinder.  Specifically, even though defendant committed felony assaults with great bodily injury against all three victims, does the fact that he was charged with sexual assault crimes against two of the victims prevent joinder of the crimes against the other victim?  We find the answer here to be no.

Defendant Christopher Thornton was tried for three sets of crimes committed against three different victims on three separate occasions.  As to the first victim, Y., he was charged with assault by means likely to produce great bodily injury with an enhancement for personally inflicting great bodily injury (Pen. Code, §§ 245, subd.

1

(a)(4), 12022.7, subd. (a))[1] and robbery (§ 211). Against the second victim, Kimberly Doe, he was alleged to have committed oral copulation by force (§ 288a, subd. (c)(2)), kidnapping to commit rape (§ 209, subd. (b)(1)), rape (§ 261, subd. (a)(2)), assault by means likely to produce great bodily injury, and robbery, along with strike enhancements for multiple victims and kidnapping (§ 667.61, subds. (d)(2), (e)(1), (4)), as well as enhancements for personally inflicting great bodily injury and being released from custody for a prior offense before it became final (§ 12022.1). As to the third victim, Kristen Doe, he was charged with two counts of forcible rape (§ 261, subd. (a)(2)) and assault by means likely to produce great bodily injury along with enhancements for personal infliction of great bodily injury, multiple victims, and release from a prior offense.

Following a jury trial, defendant was convicted of three felony assault counts with a great bodily injury enhancement as to each, as well as petty theft (§ 490.2) as a lesser included offense of the robbery count as to Y. Defendant admitted a prior prison term (§ 667.5, subd. (b)) and was sentenced to 14 years in state prison.

On appeal, defendant contends it was an abuse of discretion and a violation of his right to a fair trial to join the charges regarding the incident without a sexual assault to the two other incidents. He further contends the assault count as to Kristen must be reversed because the court did not give a unanimity instruction. In a supplemental brief, he contends the prison prior must be stricken in light of Senate Bill No. 136.

The incidents involving each of the three victims had sufficient common threads to support joinder: felony assaults against women involving great bodily injury, his initiating the assaults by striking the victim in the face, all three victims being prostitutes with defendant hiring two of them as prostitutes, and his having sex with all three of

---

[1]     Undesignated statutory references are to the Penal Code.

2

them, either with or without consent.  Although rape charges can be very prejudicial when joined to a nonrape offense, the assault against the victim without a rape charge, Y., was sufficiently serious to minimize this risk.  Since the case involving the crimes against Y. was as strong as the respective cases regarding the other two victims, it was neither an abuse of discretion nor a deprivation of the right to a fair trial to join the cases.  The failure to give a unanimity instruction was harmless beyond a reasonable doubt.  Finding Senate Bill No. 136 retroactive, we shall strike the prison prior and affirm in all other respects.

## BACKGROUND

*Prosecution Case*

### 1.  Y. (counts one & two)

In December 2016, Y. worked as a prostitute while living with her family in an apartment in Sacramento.

On December 1, 2016, at around 2:14 a.m., defendant called Y. and asked to see her.  Y.'s sister S. took the call and told Y., who had been sleeping on the couch.  Y. knew defendant, with whom she had engaged in prostitution at her house on November 26.

Y. agreed to see defendant; she let him inside her house at around 2:26 a.m. after he called to say he had arrived.  They went upstairs to Y.'s bedroom, where she had sex with him for $200.  Y. asked defendant to leave after his time was up.

Y., with defendant following, went downstairs to get her personal phone, which was ringing.  Y. got her phone, met defendant at the front door, and let him out.  As she opened the door, defendant punched her in the nose, causing her to fall.  Y. screamed for her sister.  Defendant reached down, grabbed Y.'s phone, ran to his car, and drove off.  When S. ran up to her, Y. gasped that defendant had her phone.  S. ran outside and unsuccessfully tried to chase defendant's car.  Y. tried to chase defendant as well, but collapsed on the front door steps.

3

Y. was in great pain, was bleeding, and had trouble breathing. Her mother took her to the hospital, where she was treated in the emergency room at 3:49 a.m. Y. said she was hit in the face; medical personnel determined she sustained a fractured nose and right orbital bone. Her injuries required surgery; Y. lost her sense of smell and her nose permanently leans to the left.

The following day, Y. went to the police station and gave a statement. The day after that, December 3, 2016, she called defendant and spoke to him to try to get her phone back. Y. recorded the conversation, which was played at trial. Asked by Y. why he had hit her, defendant replied, "Well, I don't know. It was stupid." Defendant told Y. he did not know what he was going to do with the phone, and he had cleared the phone's memory. Defendant told Y. he would return the phone, but he never did.

Y. had three interviews with the police but admitted at trial she lied about the incident in all of them. She told the police her assailant was named Adam, she met him previously at a gas station, and that he called her on December 1, 2016. She told law enforcement that she and Adam smoked marijuana and talked at her place, and she did not know why he wanted to leave her house. She never told the police about the struggle over her phone.

Y. previously lied about the incident because she did not want to get in trouble for being a prostitute. She agreed to testify after getting immunity at the preliminary hearing.

A December 8, 2016 search of defendant's home found Y.'s pink iPhone in his bedroom dresser drawer.

S. had been staying at Y.'s house most nights because she had six outstanding arrest warrants. Between 2:00 and 3:00 a.m. on December 1, 2016, S. was sleeping on the couch when she heard Y. scream out her name. She got up and found Y. lying on the floor in a fetal position near the front door with defendant standing over her. Defendant looked scared and fled through the door; S. followed after Y. said defendant had her phone. S. knocked on defendant's car window, but he sped off. She returned to find Y.

4

with blood all over her face.  She drove Y. to the hospital.  While there, S. falsely told a nurse an unknown person had knocked on the door, asked to use Y.'s phone, and then hit Y. and took the phone.

### 2. *Kimberly Doe (counts three-seven)*

In June 2017, Kimberly Doe worked as a prostitute and lived in a motel on Stockton Boulevard in Sacramento.

On June 10, 2017, Kimberly walked to a grocery store on Stockton Boulevard to buy groceries for her daughter's baby shower.  She did not know whether she used heroin that day.  After shopping, Kimberly started to cross Stockton Boulevard to get to a bus stop but tripped on the concrete median, causing her to fall and drop her ice.  Defendant drove up to Kimberly in his gold Cadillac and asked if she wanted a ride.  The Cadillac had been circling around as she walked to the store from her motel room.

Kimberly accepted defendant's offer; she crossed the street with her groceries and got into the front passenger side of defendant's car.  Although she normally did not get into other vehicles in such situations, Kimberly did so here because she had seen him talking to people that she knew.  She directed defendant to take her to the motel where she was living; on the way, defendant pulled into the parking lot of a local library.

Defendant parked his car so the passenger side was up against a fence.  Kimberly was concerned, as she now could not get out of defendant's car.  Defendant then took off his shirt and sat back in his seat.

Kimberly turned to talk to defendant, who punched her in the jaw.  A dazed Kimberly asked defendant what he wanted; he replied, "You know what it is."  Defendant then told Kimberly, who thought she was going to be raped, "You're gonna suck my dick."  Afraid she would be killed, Kimberly put defendant's penis in her mouth. Defendant wiped her bleeding mouth off with his shirt.

Defendant eventually said he wanted to go somewhere else.  He put his hands down Kimberly's pants searching for her private parts while she was on her knees in the

5

passenger seat. Defendant next started to drive while telling Kimberly to act as if she enjoyed it.

After driving for a few minutes, defendant parked his car in the parking lot behind a Stockton Boulevard business. He got out of the car and directed Kimberly to pull her pants down and move across the car towards him. Kimberly complied, but asked defendant to use a condom as she knew he was going to rape her. Using a condom, defendant had intercourse with her for about 20 minutes, asking her to make noises like she enjoyed it. Defendant let Kimberly out of the car after he stopped, but not before going through her groceries and taking the money from her purse. He then got into his car and drove off.

Humiliated, disgusted, and in pain, Kimberly walked back to her motel. She told her husband but not the police, because she did not think they would do anything. She went to bed while her husband called Kimberly's counselor at Community Against Sexual Harm (CASH).

On June 10, 2017, at around 8:00 a.m., CASH case manager Kristie Kiefer got a text message that Kimberly had been attacked and sexually assaulted. Kiefer called Kimberly and then drove her to the hospital at around 11:00 p.m. Kimberly was disheveled, tired, and emotional, and had a bleeding gash on her lip.

Kimberly told the emergency room physician she had been raped and assaulted in a parking lot and had been struck multiple times. She sustained a laceration on the inside of her lip, crooked teeth, a tender jaw, and difficulty opening her mouth. Kimberly declined the doctor's recommendation to stitch her wound.

Kimberly was also given a sexual assault exam at the hospital. She told the examiner that she was assaulted in the front seat of a car in a library parking lot. Kimberly said that after being picked up and driven to the parking lot, the driver took off his shirt, had her leave the car, and then forced her to orally copulate him. She asked for

6

him to stop but blacked out after he hit her in the mouth. Kimberly regained consciousness in another location, where the man used a condom while raping her.

Kimberly declined anal and genital examinations. The examination findings were consistent with Kimberly having been hit in the face.

Kimberly knew the victim in counts eight through ten, Kristen. They talked to each other about their attacks.

### 3. Kristen Doe (counts eight-ten)

Kristen Doe lived on the streets in Sacramento, working as a prostitute for the last five years to support her heroin addiction. She testified under a grant of use immunity.

Kristen was working on Stockton Boulevard near the same motel that Kimberly lived in during the early morning on December 27, 2017. Around 4:30 a.m., defendant drove around her several times in a champagne-colored Cadillac. After he pulled up to her, Kristen told defendant she only did oral sex for $60. After defendant agreed, Kristen got in the front passenger seat; she noticed he was very polite, handsome, and sweet.

Defendant drove Kristen around looking for a suitable spot before they agreed to park in a residential area by 14th Avenue. After parking, he told Kristen he had only $30 cash and asked if he could use a prepaid visa card to pay. Although Kristen determined there was a $50 balance on the card, she declined it as payment because she needed cash to buy drugs. When Kristen asked to be returned to Stockton Boulevard, defendant told Kristen she was "gonna do it for free now, bitch," and then punched her repeatedly in the face.

Defendant hit Kristen about 15 times. Wanting defendant to stop, Kristen said, "Okay, okay, okay. What do you want?" Defendant replied he would not achieve an orgasm through oral sex because he had used cocaine, so he needed "full service," a euphemism for vaginal or anal intercourse.

Defendant exited the car, went over to the passenger side, pulled Kristen out by her hair and shoulder, threw her chest onto the back hood, tore off her stockings, and

7

inserted his penis into her vagina from behind. After about five minutes, Kristen wriggled free and started to run away. Defendant caught her, slammed her chest onto the front hood, and raped her from behind for another 10 minutes.

When Kristen tried to run away again, defendant threw her to the ground and repeatedly stomped on Kristen's body and face. After a car drove by, defendant took Kristen's purse and drove off. Kristen hid behind a car until the sun came up so defendant could not come back and get her.

Kristen eventually walked to a gas station, where she called the police on another person's cell phone. She was hurt and bleeding badly with a swollen face, hole in her lip, two black eyes, a bruised chest, and what felt like a broken sternum. An officer dispatched to the area found her in front of the gas station, crouching down with a blanket over her. Kristen had bruising and swelling around her forehead and eyes and a cut on her upper lip. She also had an abrasion by a tear in her stockings. Kristen told police she gave defendant an alcohol wipe, which he used to wipe himself off before throwing it to the ground.

Kristen was taken to the emergency room in an ambulance. She told the treating doctor she was physically and sexually assaulted. Kristen had a tender left jaw, a laceration of the lower lip caused by her teeth going through the skin, cuts to her ear and upper lip, and abrasions to her chest. She also had bruises and abrasions over much of her body, including her abdomen, back, arms, and left leg, as well as chest and lung contusions.

Kristen started to get sick from heroin withdrawal while she was in the hospital, having done a "speedball" of heroin and methamphetamine earlier that day. Needing a fix, she declined to undergo a sexual assault examination. Kristen removed the IV from her arm, swore at the officer, and left the hospital.

Video surveillance from the motel showed Kristen and defendant's car out front on Stockton Boulevard at around 4:00 a.m. A police video camera recorded defendant's

8

Cadillac driving south on Stockton Boulevard from Broadway at 3:08 a.m. on the day Kristen was attacked. The area where defendant's car was driving was close to the motel.

When defendant was arrested in his car on January 10, 2018, he had two cell phones, one of which he had used to contact Y. He had cuts on his knuckles when arrested. Defendant is six feet five inches tall and weighs 220 pounds.

In an interview with the police, defendant admitted being the primary driver of the Cadillac, but could not recall if he was driving on Stockton Boulevard on December 27, 2017, saying so even after being shown the video recording of his car driving there at that time. He did not recall picking up a prostitute at that time, even after being shown the video of Kristen and his Cadillac by the motel. Defendant did not respond when he was asked what happened.

### 4. Forensic Evidence

No foreign DNA or fresh sperm or semen deposits were found on Kristen or her clothing. A bloody wipe and cotton pad found at the scene of the attack on Kristen did not find semen or sperm and DNA results excluded defendant as a contributor.

A cotton swab from the driver's seat of defendant's Cadillac found neither blood nor semen. Swabs from blood on the driver's side interior door found defendant as a contributor on two swabs, with Kimberly excluded as a contributor and Kristen a contributor on one swab.

### The Defense

#### 1. Background

Defendant worked for his father's real estate and property management company for about five years before his arrest. According to his father, defendant would work from 8:00 a.m. to 5:00 p.m., but not every day. His father testified that there was no reason for defendant to be working between the hours of 11:00 p.m. to 7:00 a.m. Several properties on Stockton Boulevard were among the properties managed by the father's business.

9

Defendant admitted having hired escorts and prostitutes since 2014, doing so because he was busy at work and not looking for a relationship. He was seeing prostitutes two to three times a week by 2017, getting addicted to the practice. Defendant started finding prostitutes on an area of Stockton Boulevard called "the Stroll." Finding prostitutes there was much more dangerous than doing so online. He had seen hundreds of prostitutes on the Stroll, only stopping for a short time after seeing his pastor.

Once while seeing a prostitute on the Stroll, the prostitute stole defendant's wallet from the dashboard and bolted out the door as defendant leaned back while she was performing oral sex on him. Another time, two men tried to rob defendant at gunpoint in a hotel room where defendant went to meet a prostitute he had found online.

### 2. Y.

Defendant met Y. through the internet. In November 2016, he called to confirm her rates and engaged her services at her house for later that day. When defendant arrived at her house, Y. took him upstairs, where he paid and they had oral sex and intercourse. Defendant told Y. his real name and there were no problems. As he was leaving, defendant asked Y. if she ever smoked marijuana. Y. said she did, and defendant replied that he would bring some over some time.

Defendant called Y. for sex at around 2:14 a.m. on December 1, 2016. Y. agreed to see him for an hour; she also agreed to smoke marijuana with him. Defendant noticed several cars were present when he arrived at her home. He called Y., who told him to park by a nearby dumpster.

Y. met defendant at the door and let him inside. They walked to the family room where a 35- to 40-year-old man and S. were sitting on the couch, watching television and drinking alcohol. Defendant introduced himself and brought out the marijuana; they all seemed to be getting along.

The mood changed when the man claimed to have sold marijuana to the cannabis club where defendant had obtained the marijuana. Defendant told the man he did not

10

believe this; the man replied he belonged to the Starz gang and called people in another Oak Park gang "suckers." When defendant named some people from Oak Park and said he was okay with them, the man accused defendant of being affiliated with the Oak Park gang. Defendant denied the accusation, but the man did not believe him. The man was upset because one of the people defendant named was part of a group that shot and killed one of the man's friends.

Uncomfortable with the escalating situation, defendant decided to leave before having sex with Y. As defendant got up and walked to the front door, the man followed defendant and confronted him. Although a few inches shorter than defendant, the man was bigger than him. The man swung at defendant as defendant tried to open the door; the man missed when defendant moved out of the way. Defendant asked the man what was going on, and the two began to wrestle in the hallway.

Defendant eventually swung at the man and missed, and then threw him to the floor. Y. and S. were standing behind the man, near the stairs. S. darted in and hit defendant in the chest, causing him to grab her by the face and shove her so she fell down. When Y. came at defendant with her fist up, defendant hit her in the face with his left hand, causing her to grab her nose and fall onto her back.

Concerned the man was going to get a weapon, defendant took a pink phone he thought was his and ran out the door to the car after the man came back down the hallway. The man yelled at defendant to get out of the car while S. and Y. swore at him and banged on his car windows.

Later that night, defendant determined the phone he grabbed was not his. He spoke to Y. on the phone several times after the incident. He called her first, speaking to Y. and her husband, who were threatening. Defendant said he did not take the phone on purpose, and while willing to return it, he would not go to her house because he was afraid. Y. declined to meet in a public place as she could not get a ride.

Defendant claimed the "It was stupid" statement in the recorded call meant only that the situation was stupid. He just reacted when he hit Y. During their first conversation, defendant told Y. he was sorry she was injured and he did not mean to take her phone. He erased the phone's memory so the police could not trace it.

### 3. Kimberly

Defendant was coming out of a gas station and looking for a prostitute when he picked up Kimberly, whom he thought was a prostitute given what she was wearing and where she was standing on the Stroll. He pulled up to Kimberly and asked if she was working; she said yes and got into the passenger side of his car. She was not carrying any groceries.

Kimberly accepted defendant's solicitation of oral sex for $40. She directed him to the library parking lot on Stockton Boulevard, where he parked near a fence. She told him to get ready, and grabbed a condom from her purse and performed oral sex on him. Kimberly stopped and asked for her money after about five minutes. Not having ejaculated, defendant did not want to pay but gave her $20 from his center console. This angered Kimberly, who threatened to have her husband beat him if defendant did not pay the rest of the money.

Kimberly started texting and again asked for the rest of her money after defendant refused to pay any more. After defendant said he would not pay until she finished and he would get another prostitute, Kimberly tried to open the center console, but defendant stopped her. He reached over her to open the passenger door and shove her out. Kimberly hit him on the face with her fist; defendant responded by hitting her in the mouth and pushing her out onto the street. He threw her property out the door, closed the door, and drove off. He did not force her to have oral sex or rape her. He did not take her to the other location she claimed he did.

12

*4. Kristen*

Defendant admitted picking up Kristen in his Cadillac at the motel where she lived. She agreed to perform oral sex on him for $40; he had a couple of $100 bills, $30 in cash, and some gift cards. She directed him to a location near 15th Avenue and 52nd Street. As he parked the car, defendant told Kristen he would need change or she would have to accept a $50 gift card as payment. After calling and verifying the funds, she accepted the card as payment.

After snorting something from a clear bag, Kristen put a condom on defendant and performed oral sex on him. Defendant soon stopped Kristen after a police car drove by. He was on bail for the incident with Y. and told Kristen he wanted to move. Kristen suggested a friend's house around the corner and defendant agreed. When she told defendant he had to pay $40 to rent the room, defendant made a counteroffer of $20, which she accepted.

After they walked to the house, Kristen asked defendant to let her talk to her friend alone; a man answered the door and started to argue with Kristen. Defendant decided he did not want to rent the room and told Kristen he was heading back to his car. When Kristen caught up to him at the car, defendant said he did not want to continue what they were doing. Defendant told Kristen she could keep the $20 but he wanted the gift card back. She did not take this well, and they started arguing in his car. Kristen said she was going to keep the card because defendant wasted her time and asked for a ride back to where he picked her up.

Defendant told Kristen he was not taking her anywhere and told her to leave the car. Kristen started looking through her purse and asked where her dope was. When defendant said he did not have it, an increasingly argumentative and aggressive Kristen began pulling things out of her purse. After they both failed to find the drugs, defendant told Kristen to leave but she refused to go without her drugs. He tried to reach around

13

Kristen and push her out of the car. Kristen hit defendant in the right cheek as she told him to get his hands off of her.

After again telling her to get out, defendant unsuccessfully tried to push Kristen out of the car. Kristen hit him again with her fist, causing defendant to respond by holding her hand down with one arm and punching her once in the chest and the mouth with his left hand. The punch to the mouth hit her teeth, which cut defendant's hand and caused Kristen to bleed.

Defendant got out of the car and wiped the blood from his hand with a wipe Kristen had given him earlier. Defendant opened the passenger door to forcibly remove Kristen, who was holding a Swiss Army knife with no extended blade. He grabbed Kristen's arm, forced her to drop the knife, wrapped his arms around her, and pulled her out of the car as she yelled and screamed.

Defendant grabbed Kristen's things and threw them out of the car. As he was doing so, Kristen grabbed defendant from behind. He flung Kristen to the ground, closed the door, ran to the driver's side, and drove off. He later found a bag of dope and the gift card inside his car. Defendant drove to a gas station and wiped off his seat with a paper towel.

Defendant lied to the police because he did not trust them after being falsely accused of rape and robbery by a prostitute in 2014. He had a conviction for felony assault in 2010.

## DISCUSSION

### I

### *Motion to Sever*

Defendant contends it was an abuse of discretion for the trial court to deny his motion to sever the charges regarding his crimes against Y. (counts one & two) from the charges regarding Kimberly (counts three to seven) and Kristen (counts eight to ten). We disagree.

14

A. *Background*

The prosecution filed a motion to consolidate the charges involving Y. with those involving Kimberly and Kristen, which defendant opposed. At the hearing on the motion, defense counsel argued the charges against Y. should be severed from the other charges as the robbery and assault charges related to Y. were distinct and less inflammatory than the rape charges involving Kimberly and Kristen. The prosecutor asserted joinder was proper because all three cases involved assault charges and the evidence would be admissible in separate trials under Evidence Code section 1101. Treating defendant's opposition as a motion to sever, the trial court determined joinder was proper and denied the motion to sever, finding all three cases involved assaults and the evidence in each case would be cross-admissible under Evidence Code section 1101.

B. *Standard of Review*

Section 954 permits the joinder of "two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses." (§ 954.) Whenever such offenses are joined together, the court, "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. (*Ibid*.)

Our Legislature has expressed a preference for joint trials. (§ 954.) Because joinder ordinarily promotes efficiency, it is "the course of action preferred by the law. [Citations.]" (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*).)

Defendant argues the court erred in denying his severance motion because the evidence of the five forcible sexual assaults, the bulk of the charges in the rape cases, would not be admissible in the trial for the robbery. He further claims the rape evidence was much more inflammatory than the robbery evidence, and joinder served to combine three close cases, making the total evidence much stronger.

Because the statutory requirements for joinder have been met since all three cases involved assaults by means likely to produce great bodily injury, and consistent with legislative preference for joint trials, defendant can establish error in trying the charged offenses jointly only by making a " '*clear showing of prejudice* to establish that the trial court *abused its discretion* in denying . . . defendant's severance motion.' " (*Alcala, supra,* 43 Cal.4th at p. 1220.)  Denying a motion to sever charged offenses amounts to a prejudicial abuse of discretion only if the court's ruling falls outside the bounds of reason, considering the record before the court when it ruled on the motion.  (*Ibid.*)  Where a party seeks severance of properly joined charges, like defendant does here, he " 'must make a *stronger* showing of potential prejudice than would be necessary to exclude other-crimes evidence in a severed trial.' " (*Id*. at p. 1226, fn. 17; see also *id*. at p. 1221 [" 'The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence' "].)

To assess prejudice, we consider the following factors:  " '(1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citations.]' " (*Alcala, supra*, 43 Cal.4th at pp. 1220-1221.)  We then weigh these factors against the countervailing benefits to the state of joinder, which include " 'a single courtroom, judge, and court attach[és].  Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried.  In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process.' [Citations.]" (*People v. Soper* (2009) 45 Cal.4th 759, 772.)  In reviewing denial of a

16

severance motion, we look to "the record that was before the trial court at the time of the ruling." (*People v. Burch* (2007) 148 Cal.App.4th 862, 867.)

C.  *Cross-Admissibility*

If evidence underlying the offenses in question would be cross-admissible in separate trials of the other charges, that normally is sufficient, standing alone, to dispel any prejudice and justify a trial court's refusal to sever the charged offenses. (*Alcala, supra*, 43 Cal.4th at p. 1221.)  Complete cross-admissibility, however, is not required. (*Ibid.*)  "In other words, it may be sufficient, for example, if evidence underlying charge 'B' is admissible in the trial of charge 'A'—even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.'  [Citations.]" (*Ibid.*)

Where, as here, the issue concerns whether charged crimes should be severed from a joint trial, the degree of similarity necessary to establish cross-admissibility exists on a continuum. (*Alcala, supra*, 43 Cal.4th at p. 1222.)  That continuum, in turn, depends upon the purpose for which introduction of the evidence is sought. (*Ibid.*)

Evidence Code section 1101, subdivision (a) prohibits the admission of evidence of uncharged offenses to prove propensity or disposition to commit the charged crime. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393; *People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.)  However, subdivision (b) of that section provides that such evidence is admissible "when relevant for a noncharacter purpose—that is, when it is relevant to prove some fact other than the defendant's criminal disposition, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake of fact or accident.'  [Citations.]" (*Hendrix,* at p. 238.)  " 'Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent.' " (*People v. Lenart* (2004) 32 Cal.4th 1107, 1123.)

" '*The least degree of similarity . . . is required in order to prove intent*' " whereas "*[t]he greatest degree of similarity is required . . . to prove identity*." (*Alcala, supra,*

17

43 Cal.4th at pp. 1222, 1223, fn. 13.) The similarity needed to prove a " 'common design or plan' " falls between the relatively lenient requirement to prove intent and the more stringent requirement to prove identity. (*Id.* at p. 1223, fn. 13.) When offered for the purpose of establishing a common plan or scheme, the charged crimes " 'must demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." ' " (*Ibid.*) While " ' "the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, . . . the plan thus revealed need not be distinctive or unusual." ' " (*Ibid.*)

The trial court found evidence of the assault offenses was cross-admissible by showing "a common plan or scheme that is violent physical assaults on women with whom the defendant comes into contact for sex, either consensually or non-consensually." We agree with the trial court. We also note additional common factors in all three cases, defendant began each assault by striking his woman victim in the face. After punching his female victims in the face, defendant then continued to commit felonies against them, sexual assaults, kidnapping, and/or robberies or additional assaultive behavior. This is more than sufficient to show a common plan, rendering the assault offenses cross-admissible with respect to each other if defendant was tried separately.[2]

D. *Other Factors*

It is indisputable that sex offenses can be highly inflammatory. (*People v. Simon* (2016) 1 Cal.5th 98, 124.) "But the animating concern underlying this factor is not

---

[2]    In light of our ruling we need not determine if the trial court's additional finding that the evidence was cross-admissible to prove intent was correct. (*Florio v. Lau* (1998) 68 Cal.App.4th 637, 653 ["In reviewing a trial court's decision, we review the result, not the reasoning. A decision right in result will not be reversed because it is based on an erroneous theory"].)

18

merely whether evidence from one offense is repulsive, because repulsion alone does not engender undue prejudice. [Citation.] Rather, the issue is 'whether " 'strong evidence of a lesser but inflammatory crime might be used to bolster a weak prosecution case' on another crime." ' [Citation.]" (*Ibid.*) For example, it was proper to join a brutal rape case to home invasion robbery cases where the robbery cases were not weak. (*People v. Capistrano* (2014) 59 Cal.4th 830, 850, overruled on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 104; see *Simon*, at p. 124.)

The same is true here. While the sex crimes against Kimberly and Kristen are worse than the assault and robbery charges regarding Y., the crimes alleged in Y.'s case are nonetheless very severe, as both the robbery and the felony assault with the section 12022.7 enhancement are violent felonies. (See § 667.5, subd. (c)(8), (9).) The charges regarding Y. were not weak, either standing alone or in comparison to the cases involving Kristen and Kimberly. While all three sets of cases depended largely upon victim testimony, Y.'s testimony had the most corroboration, between defendant's admissions in her recorded call with him, and the corroborating testimony of her sister S. There are some strengths in the other cases. Kristen's case has corroborating evidence of the video surveillance of defendant's car and her DNA being taken from a bloodstain in the car. Kristen, unlike Y., never asked for immunity or changed her story. Although Y. admitted lying to the police about the attacks and testified under a grant of immunity, the strong corroborative evidence turns a potentially weak case into a much stronger one.[3] It was within the trial court's discretion to find that joinder did not attach a weak case involving Y. to stronger claims involving the sex crimes.

---

[3] The prosecution noted the evidence corroborating the crimes involving Y. in the joinder motion.

The assault evidence was cross-admissible, the sex offense charges were not unduly prejudicial, and a weak case was not joined to strong cases involving the sex offense charges, it was not an abuse of discretion to deny the motion to sever.

II

*Due Process and Severance*

Defendant additionally contends denial of his severance motion violated his rights to a fair jury trial and due process.

"[E]ven if the trial court's ruling was proper as a matter of state law, we will reverse the judgment if the defendant shows that joinder of the charges actually resulted in ' " 'gross unfairness' " ' amounting to a denial of due process during the guilt phase. [Citation.]" (*People v. Simon, supra*, 1 Cal.5th at p. 123.) "In determining whether there was such gross unfairness, we view the case as it was tried, including a review of the evidence actually introduced in the trial. [Citations.]" (*People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1434.) "Defendant has the burden to establish gross unfairness, a burden our Supreme Court has characterized as a 'high burden' " in the context of severance. (*Id.* at p. 1438.) "To establish gross unfairness amounting to a due process violation, a defendant must demonstrate a 'reasonable probability' that the joinder affected the jury's verdicts. [Citations.]" (*Ibid.*)

Defendant claims failing to sever denied him a fair trial because the evidence of the sexual assaults was not cross-admissible, the evidence supporting the rape cases of Kimberly and Kristen was stronger than the robbery case involving Y., the prosecutor urged the jury to consider evidence of the sexual assaults when determining defendant's guilt regarding the attack on Y., and the trial court did not instruct the jury that the evidence of the sexual assaults was inadmissible in the charges related to the attack on Y.

A. *Cross-Admissibility and Strength of Cases*

Additional evidence came out at trial to support the trial court's ruling that the crimes were admissible as evidence of a common plan. Defendant had engaged Y.'s and

20

Kristen's services as prostitutes before his attacks on them. Kimberly testified she was a prostitute but not working when defendant attacked her, but defendant testified he engaged her services and the area she was in was known for prostitution. The fact that all three victims were prostitutes provides further justification for the cross-admissibility of the conduct in all three incidents.

We likewise stand by our previous analysis regarding the relative strength of the three cases. The evidence corroborating Y.'s testimony stands out in comparison to the charges involving Kimberly and Kristen and counteracts any effect of her previously lying about the case to the police or testifying under a grant of immunity. We also note that there was strong physical evidence of assaults against all three victims, medical evidence documenting their injuries and Kristen's DNA being found on blood in defendant's car, and of the robbery charge involving Y., defendant's admissions and her phone being found at defendant's home. There was no DNA or other forensic evidence supporting the rape charges. This is not a case where stronger evidence of sexual assault was used to bolster weaker evidence of assault or robbery.

B. *Prosecutor's Arguments and Court Instructions*

Defendant's claim regarding the prosecutor's arguments fails when the arguments he cites are examined in context.

Defendant first identifies the prosecutor arguing "the common denominator" between cases was defendant. The prosecutor argued: "Three separate women charged, three separate days within a year. There is no factual connection between them in the circumstances of these cases. [¶] Every factual connection via the defendant, he is the common denominator. It's because he's there these things happened and there is a commonality."

This simply states that defendant is the common perpetrator against the three victims. This does not seek to influence the jury's consideration of the charges relating to Y. by reference to the sexual assaults.

21

Defendant also points to the prosecutor's argument that the rape case and robbery case involved "an intent or motive or a common plan." The prosecutor in fact argued, "Is there an intent or motive or a common plan that you find running through this?" This rhetorical question does not invoke the prejudicial aspects of the sex crimes to bolster the charges related to Y.

Defendant further claims the prosecutor told the jury to consider uncharged sex offense evidence to determine whether defendant "was the person" who robbed and assaulted Y. This refers to defendant's testimony regarding his arrest, trial, and acquittal for charges of rape and robbery committed against another prostitute, Felicia. The prosecutor argued in closing this evidence could be used to help the jury decide if defendant was the perpetrator of the charged crimes, and on rebuttal that notwithstanding the acquittal, the incident with Felicia was "[i]dentity, common plan, motive, and intent evidence." This has nothing to do with the joinder of the crimes against Y. to the other charges against Kimberly and Kristen.

The next argument identified by defendant is the statement that the jury could use the testimony of "any of the women that are charged to shed light on the other counts." The prosecutor said, "If you use any of the women that are charged to shed light in the other counts, you have to believe beyond a reasonable doubt that one of those crimes is committed. It will back up to my burden." The prosecutor argued that believing one of the victims bolstered the cases regarding the others. Since the evidence of the crimes was cross-admissible, this was not prejudicial.

Defendant's final claim of improper argument is telling the jury it could "interchange" all of the charged and uncharged acts to "see if it sheds light on what he's doing." The prosecutor argued: "But if you want to use what he did to Y. and move it forward and backwards and interchange them and see if it sheds light on what he's doing, you have to first find that one of those counts was proved beyond a reasonable doubt."

Again, the prosecutor is not relying on the sex offense evidence to support the charges related to Y.

The three cases defendant relies on do not support his desired result. *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073 is a case from the Ninth Circuit Court of Appeals and is not binding on this court. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 875.) More importantly, before the Ninth Circuit ruled, the California Supreme Court considered the matter, and, unlike the Ninth Circuit, the Supreme Court ruled that joinder did not violate the defendant's right to due process. (*People v. Bean* (1988) 46 Cal.3d 919, 940.) The California Supreme Court's ruling is binding on this court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In *People v. Grant* (2003) 113 Cal.App.4th 579, defendant's second cited case, the defendant was jointly charged with burglarizing a school and possessing computer equipment that had been stolen from a different school three years earlier. (*Id*. at pp. 583, 584-586, 589.) The court found that evidence of the two crimes was not cross-admissible to prove a common plan because, although similar, the evidence on each crime did not share common marks sufficient to support a strong inference that the defendant committed both crimes. (*Id*. at p. 589.) The crimes in the instant case, however, did share distinctive, common marks sufficient to support the inference that defendant had a common plan in attacking each of the victims.

The third case defendant cites, *People v. Earle* (2009) 172 Cal.App.4th 372, involved the joinder of a strong case of indecent exposure to a "considerably weaker" sexual assault case. (*Id.* at p. 378.) The Court of Appeal found the evidence of the two crimes was not cross-admissible. (*Id*. at p. 400.) In light of the prosecutor's "heavy and pervasive reliance on" the indecent exposure evidence in arguing to the jury, the defendant was deprived of a fair trial. (*Id.* at pp. 409-411.) Unlike *Earle*, the evidence here was cross-admissible and the prosecutor did not rely on a stronger or more inflammatory sex offense charge to bolster weaker charges. *Earle* is inapposite.

23

Defendant has failed to carry his heavy burden of proving that he was deprived of a fair trial or due process.

III

*No Unanimity Instruction on Count Ten*

Defendant contends the trial court prejudicially erred in failing to give a unanimity instruction regarding count ten, the assault charge involving Kristen.

"In a criminal case, a jury verdict must be unanimous. [Citations.] Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [his or her] guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id.* at pp. 1134-1135.)

Defendant claims the prosecutor presented two different acts that could have constituted the assault count with great bodily injury enhancement against Kristen, when he punched her in the face while she was in the car and later kicking her when she was on

24

the ground. Claiming the prosecutor failed to elect between the two acts, defendant concluded he was entitled to a unanimity instruction and the court's failure to give one was prejudicial. He further claims the continuous course of conduct exception does not apply because he offered different defenses to each act and there was a reasonable basis for the jury to distinguish between the two acts.

The evidence shows defendant punched Kristen in the face about 15 times while in his car before taking her outside and raping her from behind on the car's hood. When Kristen tried to run away a second time, defendant grabbed her, threw her to the ground, and repeatedly stomped her body and face. Defendant claimed self-defense regarding hitting Kristen in the car, stating he struck her one time after she kept hitting him in the face after she accused him of taking her drugs. Regarding the stomping outside the car, defendant claimed that it never happened, testifying that after punching Kristen he then pushed her out of the car before driving away.

Defendant did provide different defenses to the two sets of attacks. While the prosecutor argued that the assault began with punching the face, the prosecutor also repeatedly argued that both the punching and the kicking were assaults. This is not a sufficiently clear election to eliminate the need for a unanimity instruction. (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1539 [election must be made with "clarity and directness"].)

We nonetheless find the error harmless even under the *Chapman* harmless-beyond-a-reasonable-doubt standard. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 576-577 [noting split of authority as to whether *Chapman* or *Watson* standard applies to erroneous omission of unanimity instruction].)[4] There is overwhelming evidence defendant assaulted Kristen and personally inflicted great bodily injury on her. Kristen's

---

[4]     *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705]; *People v. Watson* (1956) 46 Cal.2d 818.

25

DNA was found in blood inside his car, and the severe injuries she sustained over her body are incompatible with defendant's claim of punching her in the face one time.

The extent of injuries suffered by Kristen likewise negates any claim of self-defense. To prevail on a claim of self-defense to the crime of aggravated assault, not only must the defendant honestly and reasonably believe he was in imminent danger of suffering bodily injury or being touched unlawfully, his use of force must be reasonable in light of the circumstances presented. (*People v. Pinholster* (1992) 1 Cal.4th 865, 966, overruled on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.) It is specious to believe that defendant, a six-foot, five-inch tall, 220-pound man, was so at risk by punches in the face from a heroin-addicted Kristen that the force he employed on her was proportionate to the threat he faced.

We conclude beyond a reasonable doubt that the jury would reach the same verdict on count ten had a unanimity instruction been given.

IV

*Prior Prison Term Enhancement*

In a supplemental brief, defendant contends the prior prison term enhancement cannot stand in light of Senate Bill No. 136. The Attorney General concedes the point. We agree.

On October 8, 2019, the Governor signed Senate Bill No. 136, which amended section 667.5, effective January 1, 2020. (Stats. 2019, ch. 590, § 1.) Senate Bill No. 136 narrowed eligibility for the one-year prior prison term enhancement to those who have served a prior prison sentence for a sexually violent offense.

Defendant's prior prison term was not for sexually violent offenses. Defendant is therefore entitled to the ameliorative benefit of the statute if Senate Bill No. 136 is applied retroactively. We agree with the parties that the amendment to Senate Bill No. 136 should be applied retroactively in this case.

Whether a particular statute is intended to apply retroactively is a matter of statutory interpretation. (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307 [noting " 'the role of a court is to determine the intent of the Legislature' "].) Generally speaking, new criminal legislation is presumed to apply prospectively unless the statute expressly declares a contrary intent. (§ 3.) However, where the Legislature has reduced punishment for criminal conduct, an inference arises under *In re Estrada* (1965) 63 Cal.2d 740, " 'that, in the absence of contrary indications, a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' [Citations.]" (*Lara*, at p. 308.) "A new law mitigates or lessens punishment when it either mandates reduction of a sentence or grants a trial court the discretion to do so. [Citation.]" (*People v. Hurlic* (2018) 25 Cal.App.5th 50, 56.)

Senate Bill No. 136 narrowed who was eligible for a section 667.5, subdivision (b) prior prison term enhancement. There is nothing in the bill or its associated legislative history that indicates an intent that the court not apply this amendment to all individuals whose sentences are not yet final. Under these circumstances, we find that *In re Estrada*'s inference of retroactive application applies. (Accord, *People v. Lopez* (2019) 42 Cal.App.5th 337, 340-342 [Sen. Bill No. 136 applies retroactively to cases not yet final on appeal]; *People v. Jennings* (2019) 42 Cal.App.5th 664, 680-682 [same].)

We shall therefore strike the prison prior. Since the trial court already imposed the maximum term, remand for resentencing is unnecessary.

## DISPOSITION

The prior prison term enhancement is stricken.  As modified, the judgment is affirmed.  The trial court is directed to prepare an amended abstract reflecting the modified judgment, and to forward a certified copy to the Department of Corrections and Rehabilitation.

_____/s/_____
BLEASE, Acting P. J.

We concur:

_____/s/_____
HULL, J.

_____/s/_____
HOCH, J.

28